282 So.2d 469 (1973)
Elmer C. FELDHEIM
v.
PLAQUEMINES OIL AND DEVELOPMENT CO. Mrs. Myrtle D. SWAYNE, Individually and as Administratrix
v.
PLAQUEMINES OIL AND DEVELOPMENT CO. et al.
No. 52743.
Supreme Court of Louisiana.
August 20, 1973.
Rehearing Denied September 24, 1973.
*470 Charles F. Barbera, Mollere & Barbera, Metairie, for plaintiff-applicant.
John J. McCann, New Orleans, for plaintiff-respondent.
CALOGERO, Justice.
Ownership of 125 shares of stock in Plaquemines Oil and Development Company is at issue in this litigation. The stock is represented by certificate # 83 in the name of Mrs. Dora Henrietta Stengord, deceased. Adverse claimants are Mr. Elmer Feldheim, a nephew of decedent, and Mrs. Myrtle D. Swayne, administratrix of decedent's succession.
Mr. Feldheim claims ownership because 9 months before her death, Mrs. Stengord had endorsed the certificate in blank and given it to Mr. Feldheim (by delivery to Mrs. Feldheim).
Mrs. Swayne contends that the stock represented by the certificate was owned by Mrs. Stengord at the time of her death and therefore belongs to decedent's succession.
Both the trial court and the Court of Appeal ruled in favor of Mrs. Swayne, the administratrix. For the reasons discussed hereinafter we affirm the judgments of both lower courts.
The facts we consider relevant to this dispute are as follows:
On February 27, 1964, Mrs. Dora Henrietta Stengord was the owner of two certificates of stock in Plaquemines Oil and Development Company, one being certificate number 90 representing 41 shares and another being certificate number 83 representing 125 shares.
On February 27, 1964 by authentic act, Mrs. Stengord appointed Mr. Feldheim, her nephew, as her agent and Attorney in Fact, apparently to facilitate, if and when necessary, the transaction of her business. She had just two days before returned from an eighteen (18) day stay in Mercy Hospital in New Orleans. This Power of Attorney remained in effect until the date of her death.
On February 27, 1964, the day that Mrs. Stengord executed the Power of Attorney, and continuing until June 11, 1964, Mr. Feldheim commenced a series of payments from his own account, totalling in all some $2,300.18, in payment of various debts incurred by Mrs. Stengord.
Just two days after executing the general Power of Attorney, on February 29, 1964, Mrs. Stengord endorsed over to Mr. Feldheim the certificate number 90, representing 412/3 shares of stock. Three days later, on March 3, 1964, Mr. Feldheim transmitted to the corporation that very certificate, number 90, requesting that it be transferred to his name for his account.
On March 19, 1964, Mrs. Stengord endorsed in blank certificate number 83 (125 shares) and wrote the name Elmer Feldheim at another place on the certificate. This certificate was handed to Mrs. Elmer Feldheim who in turn delivered it to Mr. Feldheim.
On April 19, 1964, Mr. Feldheim (who was already then in possession of the disputed *471 certificate, number 83) wrote to the president of the Plaquemines Oil and Development Company requesting that the transfer of certificate number 90, as well as the transfer of a certain mineral and/or royalty right (namely, a 412/3/7098 interest)[1] receive "the most prompt handling", which the Plaquemines Oil and Development Company could initiate, as "time is of the essence".
On April 29, 1964, Mrs. Stengord and Mr. Feldheim, apparently prompted by a response to Feldheim's letter of April 19, presented themselves before Mr. G. Edward Merritt, Notary Public and an attorney for the Plaquemines Oil and Development Company, and in his presence and before him as notary, Mrs. Stengord conveyed royalty rights in and to certain realty described in the act before Mr. Merritt.
Certificate number 90 was thereafter transferred on the books of the corporation and a new certificate representing 412/3 shares was issued to Mr. Feldheim. Ownership of this certificate is not in issue in this litigation. Certificate number 83 indorsed in blank by Mrs. Stengord and in Mr. Feldheim's possession was not at that time presented to the corporation with request to transfer.
Almost three months later, on July 26, 1964, Mrs. Stengord executed, in favor of D. H. Holmes Co., a promissory note in the principal sum of $4,038.61 on the face of which appears the notation "$50 a month agreeable until January, 1965 at which time payment will change as mentioned on the reverse of the contract." On the reverse of the note in Mrs. Stengord's handwriting appears the following notation: "I agree to pay $50 a month until January 1965 at which time the balance of my Club Plan account will become due. I also agree to send the entire proceeds of my royalty check from the California Co.,[2] in January 1965. In January 1965 I will make agreement to pay the balance of my Club Plan account at the rate of $75 to $100 a month."
On December 11, 1964 Mrs. Dora Stengord entered Montelepre Hospital where she remained until December 22, 1964, when she died. Eight days later on December 30, 1964 Mr. Feldheim made demand on Plaquemines Oil and Development Company for transfer to him of that stock represented by certificate number 83. The corporation refused to make the transfer and thereafter, on March 31, 1965 Mr. Feldheim brought a mandamus suit to compel the corporation to transfer the stock on their books, to him. The writ was made peremptory but on timely intervention, then application for a new trial by the administratrix and the Plaquemines Oil and Development Company, a new trial was granted.
In the new trial the writ of mandamus was recalled and Feldheim's action was dismissed. Upon application of Plaquemines Oil and Development Company the suit was converted into a concursus proceeding and in due course judgment was rendered in favor of the administratrix.
Both lower courts made factual findings, notwithstanding contrary testimony (part of it excluded hearsay by Mr. Feldheim) that Mrs. Stengord, in indorsing and delivering the certificate, had not intended transfer of ownership of the certificate to Mr. Feldheim but rather had entrusted the indorsed certificate to her designated agent, attorney in fact and nephew, in order to facilitate use of the certificate as means of producing for her ready cash in *472 case of dire need at a time when Mrs. Stengord might possibly be incapable of acting because of failing health.
The lower courts relied upon several factors in so concluding, among them,
a) that Mrs. Stengord had, 3 months after the pertinent delivery, noted on the reverse of a promissory note she furnished D. H. Holmes an agreement to send the "entire proceeds of my royalty checks from the California Company in January 1965,
b) that Mr. Feldheim's contention that certificate # 83 was transferred for services rendered her over a number of years by Mr. and Mrs. Feldheim, was implausible in light of the fact that he had already received from Mrs. Stengord 412/3 shares (as to which dividends and royalties had amounted to $7,211.15 from 2/29/64 through 4/19/71) in return for his payment of debts of decedent amounting to $2,300.18, and
c) that while Mr. Feldheim upon receipt hurriedly effected transfer of certificate # 90, he did not seek to effect transfer of certificate # 83 until after decedent's death.
We agree with the lower courts' determinations that Mrs. Stengord had not intended to transfer ownership of the certificate # 83.
The principle question posed is not whether the lower courts erred in this factual finding but whether they were free to make such finding notwithstanding provisions of the Uniform Stock Transfer Law and the admitted indorsement in blank and delivery of the disputed stock certificate, in the circumstances as here, where indorsement and delivery was by a principal to her agent.
The Uniform Stock Transfer Law (R.S. 12:621-12:643), as pertinent here, provides that title to a certificate and to the shares represented thereby can be transferred by delivery of the certificate indorsed either in blank, or to a specified person, by the person appearing by the certificate to be the owner of the shares (R.S. 12:624).[3]
There is no doubt that Mrs. Stengord could have transferred legal title by indorsing the certificate in blank (which she did) and delivering it to Mr. Feldheim (which she also did).
And if we assume that she intended to, and in fact did transfer legal title, neither she, nor her estate, could reclaim the certificate or rescind the transfer except for fraud, or duress, or such mistake as to make the indorsement or delivery inequitable (R.S. 12:630) and not even then (nor even where transfer was not intended) if the certificate has been transferred to a purchaser for value in good faith without notice (R.S. 12:630). Also, the indorsement, if incident to an intended transfer of legal title, is effectual even if she has received no consideration (R.S. 12:629), even if she had died before delivery of the certificate (R.S. 12:629)in this instance the indorsement would have to be other than in blankand irrespective whether prior to her death the stock had been transferred to the holder thereof on the books of the corporation. Culp v. Mulvane, et al., 66 Kan. 143, 71 P. 273 (Kansas 1903); Rule v. Commissioner of Internal Revenue Service, 127 F.2d 979 (10th Cir. 1942).
But Mrs. Stengord did not intend to transfer legal title, according to both lower courts and as affirmed herein by this Court.
We find nothing in the Uniform Stock Transfer Law or the general law of this *473 state to prevent this factual inquiry where as here the indorsement and delivery of the stock certificate has been by a principal to her agent, in this case to the person to whom Mrs. Stengord had entrusted her business by means of a formal, notarized power of attorney.
To begin with the Act at R.S. 12:624 provides that the owner of a stock certificate can transfer her shares by only two means, one of which is indorsement and delivery of the certificate. The law does not assert unequivocably that indorsement and delivery in all instances constitutes an irrevocable and actual transfer of legal title. Admittedly a significant consequence of such indorsement and delivery where the transferee later transfers the certificate to a purchaser for value in good faith without notice, and irrespective of the original owner's initial intention, is that the owner-transferor may not reclaim the certificate or rescind the original transfer (R.S. 12:630). However, there has been no transfer by Mr. Feldheim and we are not confronted with a claim by such a holder.
Furthermore, we find no provision in the Uniform Stock Transfer Law either confirming an agent's unqualified right to ownership of a stock certificate indorsed in blank and delivered to him by his principal, or foreclosing the certificate owner's right to recover the certificate. In fact, the statute provides that "in any case not provided for by this Part the rules of law and equity ... and in particular the rules relating to the law of principal and agent, . . shall govern." (R.S. 12:641)
"While it is quite true that Act # 180 of 1910 [USTA] rather than the codal provisions on sales, controls the transfer of stock, it is equally true that this act does not abrogate the general law of agency which is applicable here.... "Sentell v. Richardson, 211 La. 288, 29 So.2d 852 (1947).
Looking to the principles which govern the principal-agent relationship lends support to the legal and factual findings of the lower courts.
The contract of mandate is, according to Pothier, regulated by the rules of natural justice. McDonogh v. Delassus, 10 Rob. 481 (1845). "There must be perfect fairness, adequacy, and equity on the part of the attorney." Holmes v. Murdock, 125 La. 916, 921, 51 So. 1035, 1037 (1910).
In a case involving a negotiable promissory note rather than a certificate of stock, the Louisiana Supreme Court in Zapata v. Honorine Cifreo and Elija Bowyere, 26 La.Ann. 87, 88 (1874) said, "It was competent for the plaintiff, as agent, to treat the instrument as between himself and all other persons except his principal, as his own."
An early Louisiana case which discussed the principal-agent relationship was Succession of Boisblanc, 32 La.Ann. 109 (1880). Among the observations by that court pertinent to the matter here under consideration was (and this of course cannot be set down as an unwavering rule) that possession of the agent is the possession of the principal.[4]
*474 In summary the Uniform Stock Transfer Law does not preclude the factual inquiry which has been made in this case, and the facts as found by the lower courts and as supported by applicable legal principles governing the principal-agent relationship, are correct.
It should also be noted that relator has posed in brief and oral argument an alternative contention, one not presented in either the district or appellate court, that the power of attorney granted him by Mrs. Stengord was a mandate coupled with an interest, or an irrevocable power because according to his testimony "Mrs. Stengord was actually paying" him and his wife for the many deeds which they "had done for her over a period of 9 ½ years."
We find it unnecessary to explore this argument further, admittedly a viable one under our law (See 4 La.L.Rev. 601, 1942 and cases cited therein) because of the contrary factual findings on the nature of the transaction. As earlier related we have affirmed the holdings of both lower courts that Mrs. Stengord did not intend transferring to her agent and nephew any interest whatever in and to her 125 shares of stock in Plaquemines Oil and Development Company.
Accordingly we can and do find that there was no transfer of legal title to stock certificate number 83 in Plaquemines Oil and Development Company nor transfer of any interest whatsoever when Mrs. Stengord indorsed it in blank and delivered it to her attorney in fact, Mr. Feldheim.
For the foregoing reasons the judgment of the Court of Appeal affirming judgment of the trial court in favor of Mrs. Myrtle D. Swayne, administratrix of the Succession of Mrs. Dora Henrietta Stengord, is affirmed at the cost of relator, Mr. Elmer Feldheim.
Affirmed.
BARHAM, J., dissents.
NOTES
[1] Mrs. Stengord had owned in addition to the 412/3/7098 shares (certificate # 90) and the 125/7098 shares of stock (certificate # 83) in Plaquemines Oil and Development Company, corresponding undivided royalty rights in and to certain minerals in, on, and under lands in Plaquemine Parish, in the respective proportions of 412/3/7098.
[2] In January of each year Plaquemines Oil & Development Company disbursed to its shareholders in the form of a dividend check the royalty interest which it had accumulated in the year from California Oil Company, the lessee of it properties.
[3] The act defines "title" to mean "legal title", and not "merely equitable or beneficial ownership or interest"; "transfer" to mean "transfer of legal title"; and "delivery" to mean "voluntary transfer of possession from one preson to another."
[4] ". . . [T]he principal is entitled to recover whenever he can trace his own property, and distinguish it or its proceeds from the mass of the property of his agent.

"In general, possession is presumptive evidence of ownership; but this is not true with respect to factors, brokers, and avowed agents, whose vocation, whose daily business, is to deal with the property of others, intrusted to them for the special purposes of their vocation. Their possession misleads no one; and they cannot pledge the property of their principals, since their special business is to sell, and not to pledge or dispose of otherwise than by sale. The possession of the agent is the possession of the principal; and the principal may reclaim his property or the proceeds, in the hands of the agent, or of his executor, or administrator, or other legal representative, succeeding merely to his rights; or in the warehouse, or bank, or other depository in which either the property or the proceeds may have been placed by the agent. Of course, in all such cases, the burden is on him who asserts the ownership of that which is not in his actual possession to prove his right and title; and if he cannot do this he cannot be judically recognized as the owner ... "
"We know of no process by which the agent can become the owner of the money or the property of his principal, intrusted to him for a special purpose. The unfaithful or imprudent agent may so deal with the property of the principal as to subject it to the rights of his creditors or other innocent third persons; he may make the tracing and identification of it, and the proof of ownership difficult, even impossible; he may illegally convert it to his own uses, and subject himself to criminal prosecution, under the statute, for embezzlement or breach of trust with respect to it; but he cannot, as against his principal, make it his own; nor can he transmit it to his succession by will, or ab intestate." 32 La. Ann. 109, 110-113.