311 So.2d 514 (1974)
Gayla SMITH, Plaintiff-Appellee,
v.
James David SMITH, Defendant-Appellant.
No. 4634.
Court of Appeal of Louisiana, Third Circuit.
October 30, 1974.
On Rehearing April 9, 1975.
Rehearing Denied May 1, 1975.
Writ Refused June 20, 1975.
*515 John A. Boatner, Jr., Bunkie, Gravel, Roy and Burnes, by T. Gerald Henderson, Alexandria, for defendant-appellant.
J. Minos Simon and Louis Corne, Lafayette, for plaintiff-appellee.
Before HOOD, CULPEPPER, MILLER, WATSON and DOMENGEAUX, JJ.
HOOD, Judge.
Mrs. Gayla Smith instituted this action against her former husband, James David *516 Smith, to partition the community of acquets and gains which formerly existed between them. Judgment was rendered by the trial court determining the items of property which constituted assets of the community, and ordering that they be partitioned. Defendant David Smith appealed, contending that some of the items decreed to be community property belong to his separate estate.
The issue presented is whether the trial judge erred in decreeing that the following items of property belonged to the community: (1) 20 shares of stock in Piggly-Wiggly Leesville Co., Inc.; (2) 260 shares of stock in Piggly-Wiggly Bunkie Co., Inc.; (3) 40 shares of stock in Piggly-Wiggly Kaplan Co., Inc.; (4) a $5,000.00 Certificate of Deposit, dated August 17, 1971, issued by Avoyelles Trust and Savings Bank in the name of J. D. Smith; and (5) a 1971 Ford pickup truck.
Plaintiff and defendant were married in 1957. Both of them were employed to work in a Piggly-Wiggly grocery store in Leesville, Louisiana, in 1959, and they worked there for a period of about one year. They left Leesville in 1960, but they returned in 1962, and worked for the same business establishment for one year thereafter.
The parties moved to Bunkie, Louisiana, in 1963, for the purpose of opening and operating a Piggly-Wiggly store there. The defendant husband managed the store in Bunkie, and plaintiff worked in the store with him, for a period of about seven years, until November, 1970, when Mrs. Smith left her husband and returned to live with her parents in Nacogdoches, Texas.
In January, 1971, the parties became reconciled, and they moved to Kaplan, Louisiana, where defendant became the manager of a third family-owned Piggly-Wiggly store located in that city. His wife also worked in that store, performing such duties as bookkeeping, taking inventories and ordering merchandise. The parties lived together in Kaplan and both of them worked in the above mentioned store until they separated finally in February, 1972.
When plaintiff and defendant began to work in the Leesville Piggly-Wiggly store in 1959, that store was owned by a partnership comprised of defendant's father, Elson O. Smith, and E. Searcy Gothard. The partnership continued to own that store until September 19, 1964, when Elson O. Smith purchased Gothard's interest in the partnership.
On October 1, 1964, two separate corporations were formed, one of which was Piggly-Wiggly Leesville Co., Inc., and the other was Piggly-Wiggly Bunkie Co., Inc. Another corporation was formed on December 19, 1967, named Piggly-Wiggly Kaplan Co., Inc.
The original incorporators of Piggly-Wiggly Leesville Co., Inc., were three employees of the attorney who was engaged to assist in forming the corporation. The incorporators paid no consideration for the 100 shares of stock which were issued to them, and they admittedly had no interest in the corporation. The certificates of stock issued to the incorporators were endorsed and cancelled immediately after the corporation was formed, and the shares of stock represented by those certificates were re-issued in varying amounts to Elson O. Smith, to his wife, and to one of his three sons, David Smith. Defendant David Smith acquired ten of the re-issued shares of stock in this corporation, and he also acquired ten additional shares stated to be an original issue of stock. At the time defendant finally separated from his wife, he was the registered owner of 20 shares of stock in the Leesville corporation. Certificates evidencing ownership of these 20 shares of stock were issued in the name of defendant, but those certificates remained with other corporate records and were never delivered to David Smith.
Piggly-Wiggly Bunkie Co., Inc., was incorporated in the same manner as was the Leesville corporation. Certificates of *517 stock were issued to the incorporators, who had no interest in the corporation, and those certificates were promptly endorsed and cancelled, and the stock was re-issued. Defendant David Smith acquired one share by transfer from an original incorporator, one share as an original issue of stock, and two shares from Elson O. Smith. He later acquired 256 additional shares, by means of a 50 to 1 stock split and 30 shares transferred from Elson O. Smith and 30 shares transferred from defendant's brother, John Smith. These additional 256 shares, plus the four shares he already owned, gave defendant David Smith a total of 260 shares of stock in the Bunkie corporation. Certificates of stock for 260 shares were issued to defendant, but these certificates remained with other corporate records and were never delivered to defendant.
Piggly-Wiggly Kaplan Co., Inc., was incorporated in the same manner as were the other two corporations, except that the stock was issued directly to Elson O. Smith and to members of his family. Defendant David Smith acquired 120 shares as original issue of stock in that corporation, but he subsequently transferred 80 shares to his brother, John Smith, leaving defendant as the registered owner of 40 shares of stock in that corporation when the community eventually was dissolved. Certificates evidencing defendant's ownership of these 40 shares were issued in his name but were never delivered to him.
Both parties to this suit agree that at the time the community was dissolved defendant David Smith owned 20 shares of stock in the Leesville corporation, 260 shares in the Bunkie company, and 40 shares of stock in Piggly-Wiggly Kaplan Co., Inc. Stock certificates evidencing ownership of those shares of stock had been issued in the name of defendant David Smith, but those certificates had never been delivered to him. Since the parties judicially assert, and the evidence shows, that David Smith owned the shares of stock which are at issue here, we hold that valid title to those shares was registered and vested in defendant's name. The important issue presented, however, is whether the stock represented by those certificates became assets of David Smith's separate estate or assets of the community which formerly existed between the parties.
In addition to the above mentioned shares of stock which were held by David Smith at the time the parties finally separated, defendant also held a time Certificate of Deposit in the amount of $5,000.00, dated August 17, 1971, issued by Avoyelles Trust & Savings Bank to J. D. Smith. He also had in his possession at that time a 1971 Ford pickup truck which had been purchased on October 8, 1970, the title to which was registered in the name of J. David Smith.
Mrs. Smith instituted a suit for separation against her husband in March, 1972, and he reconvened for a judgment of separation in his favor. Judgment was rendered on June 8, 1972, in favor of the husband on his reconventional demand, decreeing a separation from bed and board between them. A judgment of final divorce was rendered a little more than a year later.
On october 3, 1972, after the judgment of separation had been rendered, Mrs. Smith filed a petition demanding that the community property be partitioned. In that pleading she alleged that the above described shares of stock in the various Piggly-Wiggly corporations, the Certificate of Deposit, and the 1971 pickup truck, in addition to other assets, belonged to the community. The issues presented by those pleadings were tried, and a judgment was rendered by the trial judge on September 4, 1973, decreeing that several items of property, including all of those above listed, were assets of the community, and ordering that they be partitioned. It is from that judgment that the appeal which is before us now was taken.
*518 Defendant contends that the shares of stock in the Piggly-Wiggly corporations, presently owned by him, belong to his separate estate. He takes the position that all of those shares were donated to him by his father and mother, or by his brother or by an original incorporator of two of those corporations. He argues that his father was the sole investor in all three of the corporations, that his father thus owned all of the stock, that all of the shares which were conveyed to defendant were conveyed as donations, and that those shares became a part of defendant's separate estate under Article 2334 of the Louisiana Civil Code. He contends that the shares of stock in the Bunkie corporation which he received as the result of a stock split retained the identity of the stock held prior to the split, and that the new shares of stock issued to him at that time continued to constitute a part of his separate estate. See Daigre v. Daigre, 228 La. 682, 83 So.2d 900 (1955).
Plaintiff contends that the three corporations were family corporations, and that they were built on the joint efforts of all members of the family. She argues that the above mentioned shares of stock were issued to her husband as extra compensation for the work he performed in helping to build the corporations, and that they became a part of the community estate. Plaintiff also contends that, regardless of who may have owned the stock prior to the time certificates were issued to defendant, there was never a valid donation to defendant of any of the shares of stock which are at issue here, because no "delivery" of the stock certificates was ever made to him and the alleged donations were not evidenced by authentic acts. Plaintiff argues that the evidence fails to overcome the legal presumption that the shares of stock acquired by her husband during the marriage became assets of the community of acquets and gains which existed between them.
Shares of stock in corporations are classified as "incorporeal things." Succession of McGuire, 151 La. 514, 92 So. 40 (1922).
Article 1536 of the Louisiana Civil Code provides that "an act shall be passed before a notary public and two witnesses of every donation inter vivos of ... incorporeal things . . . under the penalty of nullity."
It logically follows that a donation of stock must be accomplished by notarial act. Our jurisprudence, however, has created a limited exception to Article 1536, insofar as stock is concerned, by applying the provisions of the Uniform Stock Transfer Act (LSA-R.S. 12:624, formerly R.S. 12:524). LSA-R.S. 12:624 provides two means by which the owner of stock may transfer his shares and, according to our jurisprudence, if the stock certificates are transferred in accordance with the Act, a donation is deemed to have taken place, without an accompanying authentic act. Feldheim v. Plaquemines Oil & Development Co., 282 So.2d 469 (La.1973); Succession of McGuire, supra.
Under LSA-R.S. 12:624 title to the certificate of stock, and to the shares represented thereby, can be transferred only by delivery (to the intended owner) of the stock certificate which (1) has previously been endorsed by the former owner either in blank or to a specified person (the intended owner). See Feldheim v. Plaquemines Oil & Development Co., supra; Succession of Hall, 198 So.2d 511 (La.App. 2 Cir. 1967); or (2) is accompanied by a separate document containing a written assignment of that certificate or the power of attorney to sell, assign or transfer it, signed by the person appearing in the certificate to be the owner of those shares. See Succession of McGuire, supra.
As we have already noted, the defendant herein became owner of the stock in question through three separate methods.
Some of the shares received by the defendant were shown to be original issues *519 of stock[1] by the corporations in his name. The provisions of LSA-R.S. 12:624 obviously do not apply to these shares. We base this conclusion on the fact that there was simply no transfer as envisioned in the provisions of the Uniform Stock Transfer Act. Under the language of the Act there can be no "delivery" of an endorsed certificate, and no "person appearing by the certificate to be the owner of the shares represented thereby," if the shares had never been previously issued. This was merely an original issuance of stock and, in our opinion, an authentic act was necessary to classify such issuance as a donation.
As aforementioned, in no instance was the issue or transfer to the defendant of any of the stock in the three corporations accompanied or evidenced by an authentic act.
David Smith also received a number of shares in the Bunkie corporation from certain members of his family. This was accomplished, however, merely by stock ownership changes being made in the corporate records and resulting issuance of new stock certificates. Specifically, on November 12, 1971, as the result of a stock split, 60 shares (a portion of that acquired by defendant's father and brother by reason of the split 30 shares each) were transferred to the defendant by issuance of a new stock certificate in his name representing the 60 shares, the stock formerly in his name, plus the latter's increase due to the stock split. Likewise, defendant's father and brother were issued new stock certificates representing their stock holdings, less those shares transferred to the defendant.
Again it is clear that the provisions of the Uniform Stock Transfer Act do not come into play. For it is evident that no transfer took place according to the provisions in the Act, i.e., delivery of an (1) endorsed certificate, or (2) certificate with accompanying written assignment of power of attorney. There was merely a reissuance of stock certificates in defendant's name without an accompanying authentic act, the latter being required, in our opinion, to make such a donation.
The third and last means by which defendant obtained stock was through former owners[2] who endorsed the stock certificates in blank, the same being thereafter cancelled and reissued in the name of the defendant.
This is the only situation herein where the provisions of the Uniform Stock Transfer Act could apply. If the parties who owned the stock had endorsed the certificates in blank (as was done) or endorsed same over to the defendant, and had subsequently delivered them to David Smith, we would presume that a donation had taken place. We have, however, already noted, as did the trial judge, that there was no evidence to the effect that the defendant ever received delivery of these or any of the stock certificates and that instead they remained with the other corporate records. The defendant, in fact, did not know until after the community was dissolved how many shares he owned. David Smith testified that he "didn"t know anything about how the stock was or anything;" that he knew that his father and mother "were both giving me stock" but he stated that "insofar as seeing any stock, no sir, I don't remember seeing *520 any;" and that no one ever delivered a stock certificate to him.
A strong presumption exists that property acquired by either spouse during the existence of the marriage becomes an asset of the community of acquets and gains which exists between them. When it is contended that property so acquired is the separate property of one of the spouses, the burden of overcoming the presumption that such property is an asset of the community rests upon the party alleging its separate character. LSA-C.C. Arts. 2334, 2402 and 2405; R.D.M. Corporation v. Patterson, 255 La. 301, 230 So.2d 820 (1970).
All of the stock in the above mentioned corporations which was issued to David Smith was acquired by him during his marriage to plaintiff. There is a strong presumption, therefore, that all of that stock belonged to the community which existed between them. The burden of proof rests on defendant to overcome that strong presumption that the shares of stock became assets of the community.
We conclude that the evidence presented fails to overcome this legal presumption and we thus affirm that part of the judgment appealed from which decrees the shares of stock in three Piggly-Wiggly corporations to be assets of the community.
We turn now to the question of whether the $5,000.00 Certificate of Deposit issued by Avoyelles Trust & Savings Bank, dated August 17, 1971, belonged to defendant's separate estate or to the community.
Defendant admits that the above mentioned Certificate of Deposit, issued by Avoyelles Trust & Savings Bank, was purchased with funds taken from a savings account in his name, but he contends that that savings account had been built up solely by deposits from corporate funds. Defendant contends that the Certificate of Deposit actually was owned by the Bunkie corporation, that he had set aside funds of that corporation to be used as a "building fund," and that he had placed the funds in a savings account in his name merely as a convenience to the corporation, since he had been advised that a corporation could not maintain a savings account.
The evidence establishes that these three corporations were family-owned, and that defendant David Smith contributed substantially toward the organization, managing and building up of two of them. At the time of the trial defendant was receiving salaries from two of the corporations. He was actively managing the store in Kaplan and was supervising the one in Bunkie. He was entitled to a bonus each year, but he stated that he had not drawn his bonuses, that he "didn't need it" and that he just left them in the corporation.
Defendant exercised complete control over the assets of at least two of the corporations. He determined how the earnings of the businesses were to be spent, and he obviously was not accountable to anyone for those expenditures. He purchased a $7,000.00 Thunderbird automobile for his wife, for instance, and does not recall from which corporation account he withdrew the funds for it. He paid $4,249.12 from funds belonging to the Bunkie store to purchase a pickup truck, the title to which was registered in his own name, and the truck was used by him. No authority was obtained for the purchase of that truck. He paid his younger brother $100.00 per week from corporate funds, while his brother was in college and was performing no services for any of the corporations. He employed his wife to work in the stores he managed, and he either paid her in cash or she paid herself from the cash register. From time to time he borrowed amounts up to $5,000.00 from the petty cash fund of a store, without the need of any other authority. When he borrowed from a store in that manner, he stated that "I just show a cash ticket as $4,000.00 or $3,000.00 or $2,000.00 or $1,000.00, whatever it is," and that he simply *521 held the ticket himself and did not show it to the CPA. He explained "I can keep any amount of cash in the store I want to. I am the president of the corporation."
Defendant also took from the store the groceries and drugs which he and his family used, without paying for them, and he took at least some of the gasoline he used in operating his cars from the store. His doctor and hospital bills were paid from store funds. He transferred substantial sums of money from the accounts of at least two of the corporations to savings accounts in his own name, without the need of any authority other than his own instructions.
The evidence shows that defendant retained the interest which was paid on the savings account which was used to purchase the Certificate of Deposit which is at issue here, and he reported that interest as his personal income on his 1971 income tax return. He explained that he did that to avoid the trouble of having to explain that the interest payments belonged to the corporation, and that "it wasn't worth messing with."
We find, as did the trial judge, that the evidence fails to offset the legal presumption that the funds which accumulated in defendant's savings account during his marriage, and which were used to purchase the Certificate of Deposit, became assets of the community.
The 1971 Ford pickup truck which defendant had in his possession at the time the community was dissolved was purchased with funds which belonged to the Bunkie corporation. The title to the truck was placed in defendant's name, however, and he used it as his personal vehicle. In answers to interrogatories which were propounded to him, defendant listed the truck was being owned by him, but he explained later that he did that only because the title to the truck was in his name. He testified that the truck actually belonged to the Bunkie store, and that the title was placed in his name solely because he negotiated with the dealer when it was purchased. The evidence shows that defendant took the truck with him when he moved from Bunkie to Kaplan, and plaintiff testified that he referred to the vehicle as "my truck."
It appears to us that the truck was purchased substantially in the same way as the Thunderbird was purchased for defendant's wife. The evidence indicates to us that defendant intended to acquire ownership of the truck. We agree with the trial judge, therefore, that the truck became an asset of the community.
The judgment appealed from decrees that the assets of the community, among other items, consists of "500 shares of Kaplan State Bank stock." The pleadings, the evidence and the reasons assigned by the trial judge show that the community actually owned only five shares of stock in that bank. The judgment must be amended, therefore, to show the correct number of shares of stock in the Kaplan State Bank, which belonged to the community.
No question is raised here as to whether any of the Piggly-Wiggly corporations might have a claim against the community, and we express no opinion as to that issue.
For the reasons herein set out, the judgment appealed from is amended by showing that the assets of the community included five shares of Kaplan State Bank stock instead of 500 shares of stock in that bank. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
Amended and affirmed.
ON REHEARING
We granted a rehearing to reconsider all of the issues presented in this case. We particularly wanted to review our holding that the shares of Piggly-Wiggly corporation stock which had been issued to David Smith belonged to the community of acquets *522 and gains which formerly existed between the parties.
After again reviewing the facts and the law, we have decided that the results which we reached originally as to all issues are correct. We assign different reasons, however, for our conclusion that the shares of stock owned by David Smith in the Piggly-Wiggly corporations belonged to the community which existed between him and Mrs. Gayla Smith.
For the reasons previously assigned, we now re-affirm that part of our prior judgment which decrees that the following items constituted a part of the community which existed between the parties: (1) A $5,000.00 Certificate of Deposit, dated August 17, 1971, issued by Avoyelles Trust and Savings Bank, in the name of J. D. Smith; and (2) a 1971 Ford pickup truck.
We also reinstate that part of our original judgment which amends the trial court decree to show that the assets of the community included five shares of Kaplan State Bank stock instead of 500 shares of stock in that bank, as incorrectly shown in the judgment of the district court.
With reference to the shares of stock issued to defendant in the three Piggly-Wiggly corporations, we held originally that the parties had judicially asserted, and the evidence showed, that defendant owned that stock, but that there had been no delivery of the stock certificates to David Smith, and that for that reason there had been no donation of those shares of stock to him. We concluded that since the evidence failed to show that there had been a donation of the shares of stock to David Smith, the evidence failed to overcome the legal presumption that the stock belonged to the community, and that the stock thus must be held to constitute a part of the community. We granted a rehearing primarily to reconsider that holding.
When the matter came up for argument on rehearing, defendant took the position for the first time that defendant, David Smith, never acquired ownership of the shares of stock at all, and that the stock thus did not belong either to the community or to David's separate estate. Defendant argued on rehearing: "(1) that there was no donation that took place of any of the shares in question and (2) that no consideration passed between the defendant and his father or other former owners for any of the shares in question and as a result `no sale', (3) that ownership never passed, and (4) that the Judgment of the Lower Court should be reversed insofar as the shares of stock standing in the name of defendant are concerned in all three of said corporations and that it should be ordered, adjudged and decreed by this Court that said shares in question in all three of said corporations are not to be included in the community of acquets and gains between plaintiff and defendant, nor is the same the separate property of defendant." We find no merit to those arguments.
Both of the parties to this suit have judicially declared that defendant David Smith owns the stock at issue here, and both of them testified at the trial not only that he owned it but that the stock was acquired by him during the marriage. In the pleadings and at the trial they differed only on the question of whether the stock was donated to defendant, and thus whether it became an asset of the community or of defendant's separate estate. Not only did the parties to this suit allege and testify that defendant David Smith acquired ownership of the stock during the marriage, but the testimony of all other witnesses supported that judicial declaration. We find nothing in the record which contradicts the allegations and testimony of the parties to that effect.
Article 2291 of the Louisiana Civil Code defines a judicial confession as "the declaration which the party, or his special attorney in fact, makes in a judicial proceeding." The article provides that such a confession "amounts to full proof against him who has made it," and that "it cannot *523 be revoked, unless it be proved to have been made through an error in fact."
In Nunez v. Ricks, 262 So.2d 585 (La. App. 3 Cir. 1972), we said that a judicial confession "amounts to full proof against the parties making it and cannot be revoked unless it be proved to have been made through an error in fact. It cannot be revoked for error of law." In Gros v. United States Fidelity & Guaranty Company, 183 So.2d 670 (La.App. 1 Cir. 1966), the First Circuit Court of Appeal said that, "a declaration . . . made in a judicial proceeding is a judicial confession, irrevocable unless made through an error of fact."
In the instant suit, plaintiff alleged in Article 2 of her Petition for Partition of Community Property that the above mentioned shares of stock in the Piggly-Wiggly corporations were acquired "during the existence of the community of acquets and gains existing between plaintiff and defendant." Defendant David Smith, in answer to the above allegation in plaintiff's petition, alleged "that said shares in all three of said corporations are his separate property." In an amended answer, he again alleged that ". . . the shares of stock in Piggly-Wiggly Bunkie, Inc., Piggly-Wiggly Leesville, Inc., and Piggly-Wiggly Kaplan, Inc.... are defendant's separate property . . ."
In a pre-trial deposition defendant David Smith testified that he owned 20 percent of the stock in the Leesville corporation, and 40 percent in the Bunkie corporation. he said, "all of it (the stock) was given to me by my daddy." He made substantially the same statements at the trial, asserting several times that his parents had given him the stock.
Defendant's parents, Mr. and Mrs. E. O. Smith, were the only persons who supposedly would benefit from a holding that ownership of the stock was never acquired by David Smith, and they testified without qualification in behalf of defendant that they had given the stock to their now divorced son and that he owned it.
Cohen Knight, a certified public accountant called by defendant, identified a composite recapitulation of the stock in the three Piggly-Wiggly corporations, which showed David Smith as being the owner of the shares of stock which are at issue here. Exhibit Pen 9, identified by Knight and introduced in evidence by defendant, is entitled "Stock owned by David Smith in family corporations at 3/20/72." That exhibit shows the various shares of stock owned by defendant in the three Piggly-Wiggly corporations, the stock certificate numbers, the total shares outstanding and the `Book value of David's stock.'
During the trial defendant David Smith introduced and filed in evidence, marked Exhibits D-29 through D-32, the original stock certificates which had been issued to him representing the shares of stock which are at issue here. All of the certificates were issued during the marriage of the parties, and those relating to the Bunkie and the Kaplan corporations were signed by David Smith, as president of each such corporation. Defendant must have had all of those certificates in his possession, because he produced and filed them in evidence at the trial. Since he signed most of the certificates and had all of them in his possession at the trial, it appears that we erred in holding originally that there had been no delivery of these shares of stock.
The allegations in defendant's pleadings that the shares of stock in these corporations belong to David Smith's separate estate are inconsistent and cannot be reconciled with the argument defendant makes for the first time on rehearing that he doesn't own the stock at all. We conclude that the allegations in his pleadings, together with his testimony, constitute a judicial confession or declaration by defendant that he acquired ownership of the stock during the marriage.
Aside from the circumstance that defendant has judicially declared that he acquired *524 ownership of the shares of stock during the marriage, we think a legal presumption exists that the stock was owned by defendant at the time of his separation from plaintiff, and that the evidence supports, rather than tends to negate, that presumption. LSA-R.S. 12:623 provides:
"The person to whom a certificate was originally issued is the person appearing by the certificate to be the owner thereof, and of the shares represented thereby, until and unless he indorses the certificate to another specified person, and thereupon such other specified person is the person appearing by the certificate to be the owner thereof until and unless he also indorses the certificate to another specified person. Subsequent special indorsements may be made with like effect."
As indicated by the above statute, a certificate of stock serves as prima facie evidence that the person to whom the certificate was issued is the owner of that stock. Succession of McGuire, 151 La. 514, 92 So. 40 (1922); Scobee v. Continental Hotel Corporation, 242 So.2d 610 (La.App. 1 Cir. 1970) The issuance of a certificate of stock by a corporation is a declaration by that company that the person in whose name the certificate is made out is a shareholder in the company. State v. Bank of Baton Rouge, 125 La. 138, 51 So. 95 (1910). See also, Volker v. Crescent City Wholesale Florist, 17 So.2d 372 (La.App. Orl.1944); Handwork v. Standard Galvanizing Company, 338 Ill.App. 203, 86 N. E.2d 867 (1949).
In the instant suit, a legal presumption exists that the stock was owned by David Smith, since certificates of stock had been issued to him and he is the person appearing on the certificates to be the owner of that stock. There is no evidence in the record to contradict that presumption. For this reason, as well as the other reasons previously assigned, our conclusion is that David Smith owned the stock at the time of the separation.
We turn now to the question of whether the shares of stock owned by defendant in the three Piggly-Wiggly corporations belonged to the community or to his separate estate.
Property acquired during the existence of the community of acquets and gains is presumed to be community property. LSA-C.C. arts. 2334, 2402, 2405. The burden of overcoming this presumption rests upon the party asserting the separate and paraphernal nature of the property. To overcome this heavy burden, the proof must be clear, positive and of a legally certain nature that the property for some reason did not become a part of the community. Succession of Pittman, 282 So.2d 799 (La.App. 1 Cir. 1973); R.D.M. Corporation v. Patterson, 255 La. 301, 230 So. 2d 820 (1970); Harville v. Campbell, 221 So.2d 273 (La.App. 2 Cir. 1969); Graves v. United States Rubber Co., 237 La. 505, 111 So.2d 752 (1959).
In R.D.M. Corporation v. Patterson, supra, our Supreme Court said:
"A strong presumption exists that all property acquired by either spouse during the existence of their marriage becomes an asset of the community. Montgomery v. Bouanchaud, 179 La. 312, 154 So. 8 (1934); Schwab v. Hava, 154 La. 922, 98 So. 420 (1923). The presumption continues until conclusive proof is made of separate ownership. La.Civ. Code arts. 2402, 2405. Bachino v. Coste, 35 La.Ann. 570 (1883). And the burden of overcoming this presumption rests upon those who alleged the separate and paraphernal character of the particular property." (Emphasis added).
We have already noted that the stock at issue here was acquired by defendant during his marriage to plaintiff. A strong presumption thus exists that the stock became an asset of the community, and a heavy burden rests on defendant to overcome that presumption and to establish that the stock instead belongs to his separate estate.
*525 As already noted, we held originally that there had never been a delivery of the stock certificates, that there had not been a valid donation of the property, and that the evidence thus failed to overcome the presumption which exists that the stock became a part of the community. We have decided now, however, that it is immaterial whether there was or was not a "delivery" of the stock certificates to defendant in this case, and that in either event the result must be the same. Whether there was or was not a delivery of those certificates, we believe that the evidence fails to overcome the strong presumption that the shares of stock represented by those certificates became assets of the community which existed between the parties. We thus withdraw our earlier finding that there was no delivery of the certificates of stock to defendant, and although we arrive at the same results, we recall and rescind that part of our original judgment which assigns that factual finding as one of the grounds for holding that the above shares of stock belonged to the community.
The evidence tending to show that the shares of stock at issue were donated to defendant consists largely of the testimony of defendant and that of his father and mother. At the trial defendant testified that he had made no investment in any of the three corporations, and that he knew nothing about the ownership of the stock, except that he was aware of the fact that his father and mother were donating stock to him from time to time. He made these statements despite the fact that he was president of two of the corporations, and he signed the stock certificates which were issued to David Smith by those corporations. He was secretary of the other corporation.
Defendant's father, Elson O. Smith, testified that he had put up all of the money which had been invested in the three Piggly-Wiggly stores. He stated that when the three stores were incorporated, and from time to time thereafter, he and his wife donated stock in those corporations to their son, David Smith, and that the latter paid no consideration for that stock.
Although defendant's father asserts that he put up all of the money which was invested in the three stores, no cancelled checks or receipts were produced tending to show that he made any such investments. He conceded that he borrowed some of the money which he invested in the Bunkie corporation, and there is no showing as to whether the amounts he invested were used for the purchase of stock, or were loaned to the corporation. There is no showing as to whether the loans which he made were repaid by him or were paid from corporate earnings. A "Balance Sheet" prepared by an accountant for the Bunkie corporation showing the assets and liabilities of that company as of November 30, 1969, lists Elson O. Smith as a creditor of the corporation for $21,265.25, which indicates that Mr. Smith expected to be paid back at least some of the monies which he advanced to the corporation. Other balance sheets show that as of December 31, 1971, and March 31, 1972, that indebtedness had been reduced to $18,242.40.
With reference to the Kaplan corporation, Elson O. Smith testified, ". . . we had pretty well all the money that went in there but there was some that was borrowed. I furnished it all." There is no showing as to how much he invested or how the loans he made were repaid.
Our concern in this case is whether the shares of stock now owned by defendant were originally owned by Mr. or Mrs. Elson O. Smith, and if so, whether they were donated to defendant. We pointed out in our original opinion the manner in which these corporations were formed, and that in each instance at least some shares of stock were issued to David at the time each corporation was created. In the Leesville corporation, for instance, David acquired ten shares of stock from the original incorporators (not his father or mother) and ten additional shares as an original issue of stock. In the Kaplan corporation *526 David acquired 120 shares as his part of the original issue of stock, and he subsequently transferred 80 of those shares to his brother, leaving him with 40 shares of stock. According to the corporate records, therefore, most of the stock now owned by David was acquired by him as original issues of stock. The records do not show that they were transferred to him from his father or mother. The record is voluminous, and it seems to us that if Elson O. Smith had paid for the stock which was transferred to David, or if he was the actual owner of it when the transfers were made, there would have been cancelled checks or other documentary evidence to show that the stock was originally owned by Elson O. Smith.
As pointed out in our original opinion, David Smith contributed more than any other member of the family toward organizing, managing and building up at least two of the Piggly-Wiggly stores. The evidence indicates that David alone established the Bunkie store. He stated that he left Leesville in 1963 and "opened up a store in Bunkie," and that he "managed that store for almost nine years." We find nothing in the record which shows that his father assisted in any way in establishing, stocking, managing or operating the Bunkie store, except defendant's and the elder Smith's statements to the effect that the latter put up all the money that was invested in it.
The testimony tending to show that defendant's father put up all the money which was invested in the Bunkie store is contradicted by Mrs. Gayla Smith. Mrs. Smith testified that when she and her husband moved to Bunkie to open up a Paggly-Wiggly store there, they withdrew from $3,000.00 to $5,000.00 from their savings account in the Nacogdoches Savings and Loan Association, and invested it in that store. The parties had lived in Texas from 1960 to 1962, while defendant worked for the Texas Power and Light Company, which explains why they had accumulated a savings account in Nacogdoches. Plaintiff's testimony that she and her husband withdrew the above funds and invested them in the Bunkie store was not contradicted, except by the general statements of defendant and his father that the latter had put up all of the money which went into the Bunkie store.
The record shows that David went to Kaplan in January, 1971, and took over the operation of the Kaplan store his brother had been operating. Mrs. Gayla Smith explained that the store in Kaplan "wasn't doing well and we felt that with David's hand and my hand in it maybe we could pull it out." David thereafter continued to manage or operate the Kaplan store, as well as the one in Bunkie, without and apparent assistance from his father or his brother.
We re-affirm all of the factual findings in our original opinion relating to the manner in which defendant alone managed, handled and disposed of the earnings and assets of at least two of the Piggly-Wiggly corporations, without the necessity of obtaining the approval of his father or of anyone else. He explained that he had the right to do so because "I was president of the corporation," and that "that means I had authority to do it." When asked what was the source of his authority, he replied, "that is my ruling, my rules." His father, E. O. Smith, said, "well, however he ran the store was all right with me. As far as what he did with what came out of the store or how it was handled, I never questioned him about anything that was financial or otherwise." The evidence actually tends to show that David, rather than E. O. Smith, was the owner of the Bunkie and Kaplan stores.
Defendant decided, without obtaining authority from anyone else, to set up a "building fund" to be used by any of the three stores that needed it. He thereupon began withdrawing money from the Bunkie store and putting it into a savings account for that purpose, explaining that he used the Bunkie store funds because the Leesville *527 and Kaplan stores "weren't making any profits." His testimony at least implies that he had the authority, without the approval of anyone else, to use funds belonging to any of the three corporations, including the one in Leesville, for that purpose. He made it plain that he alone set up the building fund, stating that although he talked to his father about it, "I made the rule," and "it was my decision." David Smith testified that early in 1972 he loaned a substantial sum from those funds to the Leesville store, to be used to buy property in Leesville for that purpose, and that he left it up to his bookkeeper to obtain a promissory note evidencing that loan. Defendant's father was president of the Leesville corporation, and David testified to the effect that his father or that corporation were obliged to repay the amount of that loan. Such an arrangement, it seems to us, is inconsistent with defendant's argument that his father actually was the sole owner of all three corporations and that defendant never acquired an interest in any of them, not even by donation.
All of the evidence, considered in a light most favorable to defendant, tends to show that these three Piggly-Wiggly corporations were family-owned businesses, that defendant contributed substantially, more than anyone else, to the establishment and management of at least two of them, and that shares of stock were issued to defendant to evidence his interest in the corporations and as consideration for the valuable contribution he had made to the stores.
Defendant stated in one part of his testimony that "these are all brother and sister corporations." The accountant who prepared tax returns for the corporations prepared a recap (Exhibit P-9) in which the three Piggly-Wiggly stores were referred to as a "family corporation." Robert Everett, an accountant who rendered services for defendant's father, testified that he advised the transfer of stock between family members "to avoid the loss of surtax exemptions." No gift taxes were paid on any of the purported donations of stock to defendant. Mrs. Elson O. Smith stated that she and her husband "gave David and John stock for tax purposes." And, Mrs. Gayla Smith testified that:
". . . the whole family was working together and we would all, more or less, share equally in stocks, profits, whatever, from the stores. In other words, it was a family business and we were working to build it into something worthwhile for the whole family."
All of the above facts tend to contradict defendant's claim that the shares of stock he owns in the Piggly-Wiggly corporations were donated to him. After considering all of the evidence, we conclude that defendant has failed to overcome the strong presumption created by law that the stock became a part of the community which existed between him and plaintiff. We thus affirm our original holding that all of the shares of stock in the Piggly-Wiggly corporations which are at issue here belonged to the community.
In arriving at that conclusion we considered the case of Primeaux v. Libersat, 307 So.2d 740, which was decided recently by another panel of this court. Defendant relies on that case to support the position he took for the first time after a rehearing was granted in the instant suit. In Libersat, unlike the instant suit, there apparently was no showing that the defendant son had contributed substantially to the establishment and management of the corporations formed by his father. The opinion notes that the father actually paid for all of the stock which was issued. In the instant suit the evidence shows that defendant David Smith contributed substantially to the establishment, management and building up the Piggly-Wiggly stores, and in our view it fails to show that defendant's father paid for the shares of stock which were transferred to defendant. For those reasons we believe that that case can be distinguished from the instant suit. In the event there is a conflict between Libersat *528 and this suit, however, then we respectfully disagree with our brothers who served on the panel in that case, insofar and insofar only as the decision in that case may conflict with the views expressed here.
Our conclusion is that the judgment which we rendered originally in this case is correct, and we thus re-affirm and reinstate that judgment.
For the reasons herein assigned, the judgment which we rendered in this case originally is re-affirmed and reinstated. The judgment of the district court is amended by showing that the assets of the community included five shares of Kaplan State Bank stock instead of 500 shares of stock in that bank. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
Amended and affirmed.
DOMENGEAUX, J., dissents in part and concurs in part and assigns written reasons.
MILLER, J., dissents in part and concurs in part for reasons assigned by DOMENGEAUX, J.
DOMENGEAUX, Judge (concurring in part and dissenting in part).
I am unable to agree with the majority opinion insofar as it holds that (1) 320 shares of stock in the three Piggly-Wiggly Corporations, (2) the $5,000.00 Certificate of Deposit, and (3) the 1971 Ford pickup truck belong to the community of acquets and gains formerly existing between Gayla and James David Smith. I concur with the opinion only insofar as it amends the trial court judgment to show that 5, rather than 500, shares of Kaplan State Bank stock belonged to the community.
THE PIGGLY WIGGLY STOCK
In approaching the question of the corporate stock, it is necessary at the outset to reiterate the history of this case, subsequent to its reaching out court on appeal. Such is, in my opinion, important to the understanding of the present majority holding, this dissent, and the various legal arguments raised for the first time on rehearing and reargument.
On the original hearing we concluded (as did the trial judge) that the above mentioned shares were community property. The basis for this holding was the finding that the stock was not validly donated to the defendant under Civil Code Article 1534 or the Uniform Stock Transfer Act (LSA R.S. 12:624 et seq.) and that, as a result, the legal presumption, i.e. that the stock was community, being acquired during the existence of same, was not rebutted. In reaching this conclusion we found as a matter of fact, that no delivery of the stock certificates to the defendant ever took place.
Subsequently, we granted a rehearing "as to all questions". In the notice thereof to the attorneys of record we further indicated the particular interest on the part of two judges as to whether the defendant husband owned the stock if the donation was invalid and no consideration passed between father and son. This question had theretofore not been raised by the parties themselves.
As a result briefs were submitted, with defendant's attorney following the aforementioned suggestions of the court, and in obvious anticipation that a majority would possibly hold that no donation took place, contended that ownership of the stock never passed to the defendant husband. Plaintiff's counsel in turn argued essentially (1) that the defendant was judicially estopped from alleging nonownership of the stock, and (2) that consideration was not at issue, was presumed to be present, and that the alleged lack thereof could not now be complained of.
Shortly thereafter this court (under a different panel) handed down Primeaux v. Libersat, 307 So.2d 740 (La.App.3rd Cir. *529 1975) wherein we were faced with a markedly similar set of facts. In Primeaux the defendant husband alleged separate ownership of stock in two family owned corporations via donation from his father. We concluded no donation took place for the same reasons as stated in our original opinion in the case herein. As a result the stock was held not to be the separate property of the husband. At this point, however, in Primeaux, we further concluded, on our own motion, that neither was the stock community property, based upon a finding that legal title to the shares were never validly transferred to the defendant by some means (other than donation) recognized in our Civil Code, by statute, or jurisprudence.[1]
On the same date Primeaux was decided, we granted a five-panel reargument in the present case under Article 5, Section 8, Sub-section (B) of the Louisiana Constitution (1974). Because of the extreme similarity in the two cases, a copy of the Primeaux decision was sent to counsel for the parties herein.
The defendant, on reargument, maintained his position originally set forth on rehearing to the effect that defendant at no time acquired ownership of the stock. This was obviously due to our holding to this effect in Primeaux (under almost the same circumstances) and the "suggestion" by this court upon notification of rehearing of a possible similar result being reached in this case. Plaintiff in turn filed an exception of prescription to the claim that no consideration was paid for the stock certificates.
Following a hearing on reargument, the "new" majority holds (as was originally done) that the stock is community property. They do so, however for different reasons. In coming to this conclusion I opine they have misapplied the applicable legal principles and made patent errors in their factual findings.
At the outset the majority concludes that the defendantDavid Smith was legal owner of the stock certificates at the time he and his wife separated. In my opinion both the law and the evidence strongly negate such a finding.
In support of the conclusion that David Smith was the legal owner of the stock certificates, the majority relies on two legal principles: (1) judicial estoppel, and (2) the presumption that stock on the books of a corporation belongs to the person under whose name the stock is registered.
Judicial estoppel does not apply in this case. True, defendant initially claimed ownership of the stock, but this was based on his mistaken belief that the stock had been validly donated to him. Upon finding no donation he is not bound by his claim of ownership. Additionally, if estoppel does apply, it could not establish legal title in David Smith. Estoppel can only be used among parties to the suit to prevent David from raising his lack of ownership. It does not affect third parties. Estoppel is to prevent a party from asserting a defense or claim. It cannot be used to establish substantive rights.
Regardless, however, litigants are not estopped or bound by allegations in their pleadings which are only pronouncements or conclusions of law. D. H. Holmes Co. v. Morris, 188 La. 431, 177 So. 417 (1939); City of New Orleans v. Board of Commissioners, 148 So.2d 782 (La.App.4th Cir. 1962); Scurria v. Russo, 134 So.2d 679 (La.App.4th Cir. 1961).
In like manner this court is not bound by pleadings, or even by a stipulation between parties, to the effect that defendant was owner of the stock. The question of legal *530 title to the stock is a question of law. It is the function of the court and not the parties in a lawsuit to interpret the law and answer questions regarding same. New Orleans Fire Fighters Association Local 632 v. City of New Orleans, 260 So.2d 779 (La.App.4th Cir. 1972); affirmed 263 La. 649, 269 So.2d 194 (1972); Barber Asphalt Paving Co. v. St. Louis Cypress Co., 121 La. 152, 46 So. 193 (1908); 83 C.J.S. Stipulations § 10, p. 14; 73 Am.Jur.2d, Stipulations, Sec. 5, p. 539.
The presumption that stock in defendant's name is prima facie evidence that he owns the stock, is not conclusive. By establishing that no mode of transfer recognized in Louisiana took place, this presumption is rebutted.
Assuming arguendo, a legal presumption does exist, such applies in my opinion only between the corporation and the party named on the certificate to be the owner of the stock, or a third party to whom he sells. The presumption does not apply between two parties, both of whom claim to be actual owner thereof.
Applying this so-called "presumption", the jurisprudence has held that a corporation cannot allege non-ownership of stock in the party whose name appears on the face of the certificate and can be compelled to transfer stock certificates to the record owners. Similarly, our Courts have ruled that the statutes (LSA-R.S. 12:601, 623), which in effect provide that the person "appearing" to be the owner on the face of the certificate shall be "regarded" as such, are meant only as a protective device for the transferee or third party. Succession of Heckert, 160 So.2d 375 (La. App.4th Cir. 1964). This is all that the cases (cited on this proposition in the majority opinion) actually stand for.
This does not, however, make the party "appearing" or "regarded" to be owner of the stock, the actual and legal owner, if in fact he is not, when title to the stock never passed to him by valid transfer. See: Fontenot v. Drewniak, 181 So. 619 (La. App.Orl.Cir.1938).[2]
As pointed out in Primeaux, in order for a party to become owner of stock, said stock must be transferred to and acquired by the party under some method recognized in our Civil Code, by statute, or the jurisprudence. I opine such was not done herein.
We found in our original opinion that no donation took place, according to law. The majority, on reargument, comes to the same conclusion but based upon a finding that a donation was never intended. I strongly disagree. The evidence in fact preponderates to the contrary.
Elson O. Smith, defendant's father, testified he had the stock issued to his son as a gift on the advice of his accountant and that no consideration was given therefor. Defendant's mother and brother testified that defendant was given the stock for tax purposes.[3] Robert S. Everitt, a Certified Public Accountant handling the corporate books, also testified to the effect that he advised Elson O. Smith to make a gift of the stock to his sons for tax purposes, i.e. specifically to avoid loss of certain surtax exemptions. He further testified that his *531 office prepared documents for the various parties to transfer the stock as gifts.
These private writings, i.e. not authentic acts via C.C.1536, were introduced into evidence and show clearly an intent to donate. Correspondence introduced in the record between the aforementioned CPA and a Shreveport attorney handling the legal matters for the corporation further substantiates this to be the intent of the parties. In fact, the only "contrary" evidence is a statement by the plaintiff that she was "not aware" that defendant's parents were making a donation of stock. Accordingly, the evidence in my opinion leaves no doubt but that a donation was intended. Said donation was merely never perfected according to law.
In this same regard, the majority also concludes that the original opinion herein was wrong in its holding that no delivery of the shares of stock took place,[4] for the reason that the defendant signed a number of the stock certificates on their face as President of two of the corporations and the fact that he produced the shares as evidence at trial. Once again I feel the majority has erred.
The defendant's own testimony contradicts this finding and, as is evident at the time it was given, defendant alone would have benefited by a holding that a donation actually took place. As was stated in the original opinion, "We have, however, already noted, as did the trial judge, that there was no evidence to the effect that the defendant ever received delivery of these or any of the stock certificates and that instead they remained with the other corporate records. The defendant, in fact, did not know until after the community was dissolved how many shares he owned. David Smith testified that he `didn't know anything about how the stock was or anything;' that he knew that his father and mother `were both giving me stock' but he stated that `insofar as seeing any stock, no sir, I don't remember seeing any;' and that no one ever delivered a stock certificate to him."
The record further reveals clearly that the defendant merely signed whatever was presented to him by his father or CPA for the corporation and that the actual stock "transfers" were accomplished simply in the corporate stock records. Defendant's brother, John Smith, also indicated he never saw nor received any certificates of stock, nor did he even know he personally owned any.
In my opinion, it is clear that the defendant, being an officer of the corporation, standing alone, and signing stock certificates without any knowledge what they were for, does not amount to sufficient delivery as envisioned by our law. In the same sense, the fact that defendant brought the stock to trial after this controversy arose and was obviously in possession thereof at the time, does not indicate in any stretch of the imagination that delivery took place previous to the separation.
The majority finally concludes that the shares of stock were actually issued to the defendant (resulting in ownership thereof) "to evidence his interest in the corporations and as consideration for the valuable contribution he had made to the stores." I feel there is simply nothing in the record to support this conclusion.
In this regard the majority first comes to the conclusion that no real evidence exists to show that Elson O. Smith (defendant's father) was the sole investor in the corporations. On the contrary, no evidence at all exists, or is it really contended at trial or on appeal, that this was not what actually occurred.
The only testimony, allegedly to the contrary, is an unsubstantiated, self-serving *532 statement in a pre-trial deposition by plaintiff to the effect that she and her husband allegedly bought into the Bunkie store with $3,000 to $5,000 supposedly found in a joint account in the Nacogdoches Savings & Loan in Texas. At trial, however, the plaintiff contradicts her former testimony indicating the money came "out of the store somewhere". To the contrary is Elson Smith's own testimony that he furnished all the money for the three stores. David Smith also corroborated this testimony and explicitly stated that he did not himself invest any amount in the stores.
The fact that no "cancelled checks", "receipts", etc. were offered only indicates the question was not really at issue. The fact that defendant's father was listed as a creditor in the corporate books likewise is surely not an indication he was not the sole investor. It seems elementary to this writer that the corporation and its stockholders or investors are separate entities and that as an individual stockholder one can owe the corporation or the corporation owe him.
The majority further finds, in effect, that the "original issue" stock in defendant's name was not owned by defendant's father and/or mother and, as a result, could not have been "transferred" to the defendant by his parents. I would not reach the issue of who owns or owned this stock. From this record we cannot determine who does own the stock, but title of the stock did not pass to David Smith under a recognized method of transfer or acquisition.
The facts indicate without doubt that there was never any "purchase" of the stock by any party and, as aforementioned, I opine no transfer, according to law, took place. One of the original incorporators of the Bunkie and Leesville stores (in whose 3 names all of the original issue of stock of the two corporations was placed) testified that no consideration was given for the stock or received when subsequently transferred. This is also testified to by the Shreveport attorney, whose office personnel were used as the original "dummy" incorporators. Any subsequent issue of stock in these two corporations termed "original issue" was actually an addition to the number of shares originally issued. Defendant and his father both testified no consideration ever passed hands for any of the shares. This also applies to the Kaplan store stock, with the only exception being that one share was placed in defendant's name at the inception of incorporation.
The majority also concludes that the evidence tends to show David, rather than his father, was the owner of the Kaplan and Bunkie stores. There is clearly no evidence whatsoever to indicate this to be the true state of affairs. No one, including the plaintiff herself, even contends this might be so.
The fact that defendant was president of the two "family owned" corporations does not per se make him sole owner thereof. Neither does the fact that he apparently did contribute more than anyone else toward the organizing, managing, and building up of two of the stores. The fact remains that both he and his wife were adequately compensated for their services to the corporations. Defendant drew $9,100.00 a year in salary. Plaintiff-wife was paid a tax-free hourly wage in cash. Groceries, drugs, and gasoline cost the defendant and his wife nothing.
The further suggestion by the majority, i.e. that the $10,000.00 loan in 1972 from the Kaplan and Bunkie stores to Elson O. Smith to buy property in Leesville suggests lack of sole ownership by defendant's father, is likewise without merit. The ledger sheets of the corporation, in addition to the testimony of Elson Smith, the defendant, and a Bunkie banking official all reveal that transfer of funds between stores was commonplace, that each of the funds for the 3 Piggly Wiggly corporations were kept separate, and that when monies were transferred from one store to another the *533 corporate books then reflected same as to be debts to the respective "lending" store.
In addition, plaintiff-wife, throughout her testimony, reveals money was owed by her and her husband to the store for the purchase of an automobile, that the store owed David money for "left-in" yearly bonuses, that when money was borrowed from the store it was paid back, that certain items belonged to the store, etc. All of this indicates clearly that plaintiff did not believe (nor was it asserted on trial or appeal) that defendant, rather than his father, was owner of two of the stores.
I can find only one statement that might lend support to an argument that the stock was transferred for services rendered, i.e. that plaintiff had never drawn certain bonus monies from the corporation. And in this regard, both plaintiff and defendant testified at trial that the corporation owed him this money, and do not infer the "debt" had been cancelled because of a "dation en paiement" of the corporate stock.
Thus finding: (1) no donation of the stock took place,[5] and (2) that the stock was not given as a "dation en paiement", in order to conclude defendant was the owner thereof, another method of acquiring the property must be discovered in the record. There is, however, simply no evidence of such a transfer by any other means recognized in our law, i.e. sale, exchange, etc. As a result, I opine legal ownership never passed to the defendant-husband and the stock could not have become community property, via marriage to the plaintiff.
This is so despite any legal presumption to the effect that anything acquired during the community is presumed to belong to the community. For it is evident, just as the presumption itself implies, that in order for it to be applicable there must be a legal acquisition of the property. As aforementioned, I feel no such acquisition or transfer of the stock took place herein.[6]
For these foregoing reasons I respectfully disagree with the findings of the majority (insofar as the 320 shares of stock are concerned) and opine that the result reached in Primeaux v. Libersat, supra, should be followed herein, i.e. that the shares of stock are legally neither community nor separate property because legal title thereto was never transferred to or acquired by the defendant under any method recognized in our Civil Code, by statute, or jurisprudence.
The majority, by its present holding, is in effect recognizing a new method of transfer or acquisition of property (stock herein), not heretofore found under state law as it presently is composed.
THE FORD PICKUP TRUCK
We now turn to the question of the status of the 1971 Ford pickup truck. Originally we held that this item was an asset of the community. Upon reconsideration, I opine otherwise. We found as a matter of fact in our original opinion that the truck was purchased with funds belonging to the Bunkie corporation. Yet, on the basis that title thereto was placed in defendant's name and that "he used it as his personal vehicle" we concluded defendant intended to acquire ownership of it. After a closer look at the record I find no evidence to indicate that defendant used the truck as a personal vehicle. Regardless, the plaintiff herself clearly admits in her pre-trial deposition (T. 142) that the pickup truck belonged to the store. At trial she admitted to this being her testimony (T. 279) *534 and further admitted that the truck was used for business purposes. This in my opinion is sufficient to negate the presumption that the truck belonged to the community.
THE CERTIFICATE OF DEPOSIT
I likewise opine that the evidence presented overcomes any presumption that the $5,000.00 Certificate of Deposit issued by the Avoyelles Trust & Savings Bank was a community asset.
Defendant testified that the Certificate of Deposit was purchased with funds from a savings account built up by deposits from corporate funds; that it was owned by the Bunkie corporation; and that it had been set aside for a "building fund". He admitted the account was in his name but stated that it was done for the reason that he had been advised a corporation could not maintain a savings account.
This is clearly corroborated by the testimony of Ralph Couvillier, the executive vice-president of Avoyelles Trust and Savings Bank of Bunkie. He indicated that he informed the defendant that under F. D.I.C. regulations a savings account could not be put in a corporation's name and that as a result defendant set one up under his own name. His testimony further reveals that he personally deposited (or transferred) certain monthly sums in this account out of the Piggly Wiggly store accounts, and that the $5,000.00 Certificate of Deposit came from this particular account.
The plaintiff herself admitted knowledge that the stores were trying to build up a building fund and knew it was actually in her husband's name (T. 139).
The mere fact that defendant reported the interest from this savings account on his yearly federal income tax return does not in my opinion outweigh the evidence to the contrary.
In conclusion, I would further deny plaintiff's claim of prescription, filed for the first time on reargument. The plea comes too late, being filed after submission of the case for decision. LSA C.C.P. Art. 2163; See Per Curiam in Primeaux v. Libersat, supra.
For the above and foregoing reasons I respectfully concur in part and dissent in part.
NOTES
[1] These include the 120 shares in the Kaplan corporation issued to defendant at the inception of its incorporation as well as the 10 shares in the Leesville corporation and one share in the Bunkie corporation issued to the defendant on October 1, 1964, (termed original issue, actually being an increase in the number of shares of initial stock which were issued in the corporation).
[2] These include the 10 shares in the Leesville corporation and one share in the Bunkie corporation originally issued in the name of one of the incorporators and two shares in the Bunkie corporation (placed in the defendant's name on October 1, 1965) from his father and/or mother.
[1] Plaintiff-wife's attorney in Primeaux, on application for re-hearing, raised the question of estoppel (as well as a plea of prescription) and argued the defendant could not raise the issue of lack of consideration due to his status as a stockholder and the fact that he allegedly judicially confessed ownership of the stock. In a per curiam we found estoppel inapplicable and denied the plea of prescription as coming too late.
[2] The following example of this reasoning was pointed out by defendant: A stock certificate is obtained during the marriage of H & W, in H's name, thereby becoming community property. Thereafter W dies and there are children of the marriage. Although H appears owner on the face of the certificate, as a matter of fact and law, he only owns an undivided one-half interest in the certificate, inasmuch as his children are the naked owners of one-half, subject to the father's usufruct.
[3] The majority itself finds as a matter of fact that defendant's parents "testified without qualification" that they had given the stock to the defendant, and further concludes they "were the only persons who supposedly would benefit from a holding that ownership of the stock was never acquired by David Smith". Notably, at the time this testimony was given, the defendant was actually attempting to show the stock was donated and the question of his possible non-ownership had simply not been raised.
[4] If delivery had taken place, under our original holding the 11 shares of stock endorsed in blank by the original incorporators would have been validly donated under the Uniform Stock Transfer Act.
[5] See original opinion herein and Primeaux v. Libersat, supra.
[6] This result would likewise follow in the case where A would loan X an automobile (during X's marriage to Y). X would then keep the automobile for an extended period and would have possession thereof at the subsequent separation of X and Y. No one would logically contend it was community property just because X "received" the automobile during the existence of the community, since A continued to own it.