**Robert L. ALLEY, Plaintiff-Appellant Cross-Appellee,**

v.

**Louis MIRAMON, Jr., et al., Defendants-Appellees Cross-Appellants.**

No. 77–2476.

United States Court of Appeals, Fifth Circuit.

April 10, 1980.

Henry L. Klein, New Orleans, La., for plaintiff-appellant cross-appellee.

Jarrell Godfrey, Jr., New Orleans, La., for defendants-appellees cross-appellants.

Before WISDOM, GOLDBERG, and HENDERSON, Circuit Judges.

WISDOM, Circuit Judge:

In this securities fraud case, we are confronted with the task of resolving legal issues that turn on confusing and vigorously disputed facts. In essence, the question is whether the district court properly awarded the plaintiff, Robert L. Alley, damages under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976) (1934 Act) and its implementing Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979), in connection with a fraudulent sale of securities.

In May 1975, Alley filed suit against Louis Miramon, Jr., and other directors of Maison Miramon, Inc., alleging violations of Section 10(b) of the 1934 Act and Rule 10b–5. Alley maintained that Miramon, the secretary-treasurer and controlling shareholder of Maison Miramon, fraudulently induced him to transfer his stock certificate representing 200 shares in the Maison Miramon corporation by representing that the corporation needed to pledge the shares as collateral for a loan. The corporation did not pledge the shares; instead, the corporation issued 200 shares to Miramon. Several months after Alley surrendered his certificate, the directors and shareholders of Mai-

son Miramon, without notifying Alley, changed the name of Maison Miramon to Greenbriar Nursing Home, Inc., and dissolved the successor corporation. Alley did not receive any of the liquidation proceeds.

The district court found that "the transfer of Alley's stock to Miramon on the pretense that [the stock] was needed as a pledge to obtain a corporate loan was a 'sale' within the meaning of the Securities Exchange Act of 1934 as was the subsequent sale of the [corporation's] assets". The district court held that the "sales" violated Section 10(b) of the 1934 Act and entered judgment against the defendant. Alley was awarded a pro rata share of the net liquidation proceeds. Alley appealed. He maintains that he should be awarded the entire proceeds of the liquidation because he was the only owner of validly issued shares of Maison Miramon. The defendant directors cross-appealed. Miramon, on behalf of the cross-appellees, contends that Alley is entitled to no damages because he was not a bona fide shareholder in the corporation. Miramon also contends that Alley did not prove a cause of action under Section 10(b) and Rule 10b–5. We affirm.

I.

In examining the evidence in this case, we find ourselves in a quagmire. Maison Miramon, Inc., was managed with little attention to corporate formalities. Louis Miramon, Jr., formed the corporation in May 1968 upon the encouragement of an attorney, Robert R. Thorne, to facilitate the construction of a nursing home in Slidell, Louisiana.[1] The record shows that the nursing home was constructed and financed with the assistance of the Small Business Administration (SBA) and St. Tammany Redevelopment Association, Inc. (Association), a non-profit Louisiana corporation. Apparently Maison Miramon transferred $55,000 to the Association and the Association used the money to purchase a tract of

---

1. Maison Miramon, Inc. was organized under the laws of the State of Louisiana. The Articles of Incorporation were filed with the Louisiana Secretary of State on August 7, 1968.

land from Miramon.[2] The Association, with Thorne's assistance, obtained an SBA guaranteed construction loan from a local lending institution and engaged Miramon Construction Company, Inc., to build the 60-bed nursing home on the land purchased earlier from Miramon.[3] Upon completion of the construction, the Association conveyed the nursing home and the real estate to Maison Miramon.[4]

The record does not show clearly how Maison Miramon was capitalized. The corporation charter authorized capital of $100,000, represented by 2,000 shares of voting common stock with a par value of $50 a share. The charter states that Charles F. Huesman, the corporation's president and director, subscribed to 19 shares. This subscription was not paid and the shares were never executed or issued. Louis Miramon subscribed to 76 shares. Miramon's wife, Gloria Miramon, the vice-president and director, subscribed to five shares. These 81 shares were issued, but the parties contest whether the subscriptions were paid.[5] The corporation executed and issued Certificate No. 4, representing 1,029 shares, to Louis Miramon. Whether Miramon contributed capital for these shares is also disputed.[6] The corporation executed and issued Certificate No. 6, representing 320 shares, to Miramon's mother, Mrs. Louis G. Miramon, Sr., apparently in connection with her $25,000 personal loan to Miramon.[7] Certificate No. 5, representing 200 shares, was executed and issued to Robert Thorne, the corporation's attorney, in consideration for legal services.[8] These 200 shares are the subject of this lawsuit.

After holding Certificate No. 5 for a short period, Thorne conveyed his 200 shares to Alley in satisfaction of an antecedent debt.[9] Alley testified that two years later, in June 1971, Miramon informed him that the corporation planned to build an addition to the nursing home and needed Alley's shares as collateral for a construction loan. Alley also received a letter from Thorne stating that the transfer of Alley's shares to the corporation was necessary to close the loan. Miramon says he never communicated directly or indirectly with Alley regarding a loan for an addition to the nursing home and did not represent that Alley's shares were needed as collateral for such a loan. According to Miramon, he requested Thorne to obtain Alley's certificate and to transfer it to the corporation because the 200 shares originally had been illegally issued to Thorne.

Alley complied with the requests of Miramon and Thorne. The corporation issued Alley Certificate No. 7 representing 200 shares, as a replacement for Certificate No. 5, and he transferred the replacement certificate, indorsed in blank, to Miramon. The district court found that Alley had transferred Certificate No. 7 to Miramon under an agreement that the corporation would later pledge the shares to a lending institution. This finding is supported by the testimony of Alley and Thorne, and by Thorne's letter. The finding is not clearly erroneous.

Despite the agreement between Alley and Miramon, Maison Miramon never pledged Alley's stock as collateral for a commercial loan. On a date not reflected in the record,

2. The evidence shows that Miramon transferred $55,000 to Thorne, the corporation's attorney, after Maison Miramon was incorporated. Thorne, on behalf of the corporation, transferred the money to the Association.

3. Louis Miramon, Jr. was the sole stockholder of Miramon Construction Co., Inc.

4. Maison Miramon purchased the nursing home from the Association on October 27, 1970, for $366,640.

5. See Part IV infra.

6. See Part IV infra.

7. See Part IV infra.

8. We discuss Miramon's challenge to the validity of Thorne's 200 shares in Part II of this opinion.

9. Certificate No. 5 was issued to Thorne on June 30, 1969, and assigned and transferred to Alley on July 24, 1969. In consideration for the transfer, Alley cancelled a $10,000 debt owed by Thorne.

but apparently after the transfer from Alley, the corporation issued 200 shares to Miramon. Miramon testified that Alley remained a shareholder on the corporate books after these transactions.

In November 1971, the shareholders and directors of Maison Miramon, without notifying Alley, changed the corporation's name to Greenbriar Nursing Home, Inc. Greenbriar Nursing Home executed and issued to Miramon Certificate No. 1 representing 700 shares. In December 1971, Miramon called a special meeting of shareholders of Greenbriar Nursing Home, resolved to liquidate the corporation, and appointed himself corporate liquidator. Greenbriar sold its assets to Miramon. Miramon reconveyed the assets and converted the net proceeds of $158,867 to his own use with no accounting to Alley. After learning of the liquidation of the corporation, Alley filed suit in state court to recover damages that resulted from the liquidation. Apparently, Alley abandoned his state court claim and brought this action in the district court.

## II.

The principal issue in this case is whether Alley established a cause of action under Rule 10b-5. Under Rule 10b-5, it is unlawful for any person directly or indirectly, by use of any means or instrumentality of interstate commerce, or the mails, to employ any device, scheme, or artifice to defraud or to engage in any fraudulent or deceptive act in connection with the purchase or sale of a security.[10] We must determine, therefore, whether Alley proved that Miramon defrauded him in connection with a sale of securities.[11] Alley must also, of course, have proved resultant damages.

Before examining the elements of Alley's Rule 10b-5 action, we address Miramon's argument that Alley could not have been a "seller" of securities because he never owned validly issued shares in Maison Miramon. Miramon says Alley's shares were invalid because they were illegally executed and issued to Thorne, Alley's transferor. The nature of Thorne's capital contribution is unclear. Miramon maintains that the corporation issued Certificate No. 5, representing 200 shares, to Thorne in consideration for legal services rendered in obtaining SBA guaranteed financing for the nursing home. Thorne also received a $3500 SBA approved fee from the corporation for his services. Since federal regulations prohibit the payment of an unapproved contingent legal fee for services rendered in obtaining SBA financing, Miramon argues that the 200 shares were illegally issued to Thorne.[12]

**10.** 17 C.F.R. § 240.10b-5 (1979). This Court, in applying Rule 10b-5, has stated that the three basic elements to be pleaded and proved in a 10b-5 action are: "(1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by the plaintiffs 'in connection with' such proscribed conduct; and (3) resultant damages to the plaintiffs". *Woodward v. Metro Bank of Dallas,* 5 Cir. 1975, 522 F.2d 84, 93 (quoting *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750, 759).

**11.** The "in connection with" requirement of Rule 10b-5 is flexibly applied to require that there be a nexus between the defendant's fraud and the plaintiff's sale of securities. *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750, 763. The plaintiff in a Rule 10b-5 case need not establish a direct or close relationship between the fraudulent transaction and the purchase or sale, but only that the transaction involving the sale "touch" the transaction involving the defendant's fraud. *Superintendent of Insurance v. Banker's Life & Casualty Co.,* 1971, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. This Court has held that the "in connection with" test of *Su-*

*perintendent of Insurance* is satisfied when the proscribed conduct and the sale are part of the same fraudulent scheme. *Smallwood v. Pearl Brewing Co.,* 5 Cir., 489 F.2d 579, 595, cert. denied, 1974, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113. *See generally* 1 A. Bromberg, Securities Law-Fraud-SEC Rule 10b-5 § 4.7 (570)–(577); 5 A. Jacobs, The Impact of Rule 10b-5 § 38.01; Jacobs, The Role of Securities Exchange Act Rule 10b-5 in the Regulation of Corporate Management, 59 Cornell L.Rev. 27, 40–50 (1973); Note, Securities Law-Rule 10b-5, 46 Geo.Wash.L.Rev. 482 (1978).

**12.** 13 C.F.R. § 122.18 (1979) provides:

(a) Payment of, bonus . . . or commissions for the purpose of or in connection with, obtaining financial assistance through SBA is prohibited. The applicant, subject to SBA approval, may pay actual reasonable costs incurred in connection with the application, including such items as compensation, for services rendered by attorneys . . . but in no

Alley, as a transferee of these shares, therefore, was not a bona fide stockholder.

▮▮▮ Assuming that Thorne's 200 shares were illegally issued, the argument that Alley was not a stockholder fails for two reasons. First, Alley received the shares from Thorne in consideration for the cancellation of a $10,000 debt. At the time of the transfer, Certificate No. 5 was complete on its face and was signed by the required corporate officers. Thorne presented no evidence that Alley knew or had reason to know that these shares were illegally issued. Alley was a good faith purchaser of the shares for value. He was entitled to recognition by the corporation as the owner of 200 shares notwithstanding any defect in Thorne's title. *See LSA–R.S.* § 12:601; *State ex rel. Marine Bank and Trust Co. v. Go-Ro, Inc.*, 1924, 155 La. 1072, 99 So. 875, 876; *State ex rel. Louisiana State Bank v. Bank of Baton Rouge*, 1910, 125 La. 138, 51 So. 95, 97–98; *cf. Davidson v. American Paper Manufacturing Co.*, 1937, 188 La. 69, 175 So. 753, 759; *Richard v. Foods and Services, Inc.*, La.App. 1964, 162 So.2d 213, 219–20; *Good v. Breazeale*, La.App. 1963, 148 So.2d 766, 767, 11 W. Fletcher, Cyclopedia of the Law of Private Corporations § 169 (rev. ed. 1971); 7 S. Litvinoff, Louisiana Civil Law Treatise § 87 (1975). Second, the directors and stockholders of Maison Miramon, in a special meeting, expressly ratified the transfer of Thorne's 200 shares to Alley. There is no evidence that any director or shareholder at the meeting objected to the original issuance of Certificate No. 5 to Thorne or to the transfer of the certificate to Alley. The corporation, therefore, waived any challenge to the validity of Thorne's shares and the directors cannot now contest Alley's status as a stockholder. *See Wisner v. Delhi Land & Improvement Co.*, 1894, 46 La. Ann. 1223, 15 So. 690, 692; *cf. Dilzell Engineering & Construction Co. v. Lehmann*, 1907, 120 La. 273, 45 So. 138, 142.

### III.

The evidence shows that Miramon engaged in various fraudulent practices and that there was a nexus between these transactions and the corporation's liquidation.[13] The critical questions are whether Miramon used instrumentalities of interstate commerce or the mails in defrauding Alley and whether Alley had standing to sue as a seller of securities. The first question we can dispose of easily; the second is more difficult.

▮ Miramon maintains that he neither directly nor indirectly used means of interstate commerce or the mails in conjunction with a scheme to defraud Alley. There is no merit to this argument. Alley testified that he had several telephone conversations with Miramon during June 1971. During these conversations, Miramon misrepresented that Alley's shares were needed as collateral for a loan to the corporation. Alley complied with this request. This Court has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b–5. *See, e. g., Woodward v. Metro Bank of Dallas*, 5 Cir. 1975, 522 F.2d 84, 93 n.19; *Dupuy v. Dupuy*, 5 Cir. 1975, 511 F.2d 641, 642–44, *cert. denied*, 1977, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197. *See generally* 5 A. Jacobs, The Impact of Rule 10b–5 § 37:01 at 2–7 to –12. Alley also received a letter from Thorne, dated June 26, 1971, in which Thorne urged Alley to transfer his stock certificate to the corporation to facilitate the loan. Thorne was not representing Maison Miramon in June 1971, but the evidence shows that he wrote the letter upon the encouragement of Miramon. Thorne's use of the mails was a direct and foreseeable result of Miramon's request and was

---

event may an applicant make any payment in the nature of such a brokerage fee or commission.

(b) *The applicant is required to certify the names of all attorneys . . . engaged by him in connection with the financial assistance. All compensation or other charges must be* approved by SBA before payment is made, or if payment has been made, a refund of any excessive portion of the charge must be made to the applicant.

**13.** *See* note 11 *supra*.

sufficient to satisfy the jurisdictional means requirement of Rule 10b–5. *Hill York Corp. v. American International Franchise, Inc.*, 5 Cir. 1971, 448 F.2d 680, 693; *Hooper v. States Security Corp.*, 5 Cir. 1960, 282 F.2d 195, 204 n.12; *United States v. MacKay*, 10 Cir. 1973, 491 F.2d 616, 629, *cert. denied*, 1974, 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560; *Jackson v. Oppenheimer*, S.D.N.Y. 1971, [1970–1971 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 93,008 at 90, 815; *see* 3 L. Loss, Securities Regulation, Chapter 9F at 1524 (2d ed. 1961). Finally, in January 1973, the documents relating to the dissolution of the Greenbriar Nursing Home were recorded, through the use of the mails, with the Louisiana Secretary of State. Both of these uses of the mails and the use of the telephone were elements in Miramon's fraudulent scheme to liquidate Maison Miramon.

■ The district court expressly found that Alley's transfer for pledge *and* the sale of the corporation's assets were fraudulently induced "sales". We disagree, in part, with this finding. Courts applying Section 10(b) and Rule 10b–5 have defined "sale" broadly so as to extend the panoply of the 1934 Act to those who may not be sellers in the common law sense. *See Herpich v. Wallace*, 5 Cir. 1970, 430 F.2d 792, 808; *Mader v. Armel*, 6 Cir. 1968, 402 F.2d 158, 160, *cert. denied sub nom., Young v. Mader*, 1969, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459; *Dasho v. Susquehanna Corp.*, 7 Cir., 380 F.2d 262, 266, *cert. denied sub nom., Bard v. Dasho*, 1967, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470; *Hooper v. Mountain Securities Corp.*, 5 Cir. 1960, 282 F.2d 195, 203, *cert. denied*, 1961, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693. Nevertheless, Alley did

not, and logically could not, have sold his shares in the corporation on two occasions. The transfer of Alley's certificate to Miramon, pursuant to the agreement that the shares would be pledged as collateral for a corporate loan, was not intended by the parties as a sale or a contract to sell and did not convey Alley's title to the shares. Alley remained a shareholder until the corporation was liquidated. When the corporation was liquidated, however, Alley's shares were converted to a claim for cash and he became a "forced seller" with standing to sue under Rule 10b–5.[14]

Miramon's scheme to defraud Alley encompassed several transactions that occurred between June 1971 and December 1971. Miramon's fraudulent acts included obtaining Alley's stock certificate by means of false representations, changing the corporate name and liquidating the corporation without notice to Alley, and denying Alley a share of the corporation's liquidation proceeds. The parties vigorously dispute whether these transactions included a sale of securities within the meaning of Rule 10b–5.

According to Miramon, the evidence, when construed most favorably to Alley, shows only that he misappropriated Alley's shares and breached his fiduciary duty as a director and majority stockholder by liquidating the corporation without Alley's knowledge or consent. Miramon maintains that his misconduct, if any, may give rise to a state law claim for breach of fiduciary duty, but is not a violation of Rule 10b–5.[15] Miramon argues, therefore, that the district court lacked subject matter jurisdiction in this case.

---

14. *See Dudley v. Southeastern Factor & Finance Corp.*, 5 Cir., 446 F.2d 303, *cert. denied*, 1971, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101; *Coffee v. Permian Corp.*, 5 Cir. 1970, 434 F.2d 383, *cert. denied*, 1973, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146; and discussion *infra*.

15. In support of the argument that his activities were outside the purview of Rule 10b–5, Miramon cites *Santa Fe Industries, Inc. v. Green*, 1977, 430 U.S. 462, 97 S.Ct. 1292, 51

L.Ed.2d 480. *Green* held that Rule 10b–5 may not be used to adjudicate claims of unfairness by minority shareholders when there is no alleged non-disclosure or misrepresentation by majority shareholders or corporate fiduciaries. Note, Assuring Fairness in Corporate Mergers: Recent State Trends, no. 35 Wash. & Lee L.Rev. 927, 928 (1978). *Green* is not controlling in this case; Alley's cause of action is based expressly on Miramon's misrepresentations and non-disclosures.

Alley's position is that the transfer of his shares to Miramon was a pledge. Miramon converted the shares when he transferred them from Alley's name to his name. The liquidation that followed the conversion of the 200 shares, says Alley, constituted a sale of securities under Rule 10b–5.

As support for his argument that a sale of securities occurred, Alley cites recent decisions of this Court dealing with the standing of pledgors and pledgees of securities to sue for damages under Rule 10b–5. See, e. g., National Bank of Commerce v. All American Assurance Co., 5 Cir. 1978, 583 F.2d 1295; McClure v. First National Bank, 5 Cir. 1974, 497 F.2d 490, cert. denied, 1975, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402. In McClure, the plaintiff pledged stock in a corporation to a bank in consideration for the bank's renewal of a loan to the corporation. When the corporation defaulted on its note to the bank, the bank foreclosed on the corporation's land and the plaintiff's stock became worthless. The bank never foreclosed on the pledged shares. The plaintiff sued the pledgee bank, and others, alleging that her pledge constituted a fraudulently induced sale under Rule 10b–5. This Court held that the plaintiff did not have standing to sue. The "mere acceptance of a stock pledge as collateral in a privately negotiated transaction between borrower and lender does not, of itself, bring within the scope of the federal

securities acts a transaction otherwise outside their purview". 497 F.2d at 495. That a pledge does not pass title to the securities was of critical importance to the Court. Id. at 495–96. McClure held that when a debt secured by pledged securities is a default and the pledgee bank forecloses on the pledged shares, a sale is consummated and the pledgee bank might be subjected to liability in connection with the sale if it does not meet the anti-fraud provisions of the securities acts. Id. Although some courts have not been persuaded by the logic of McClure,[16] this Court continues to apply the rule that a mere pledge of securities as collateral for a loan is not a sale under Rule 10b–5. See National Bank of Commerce v. All American Assurance Co., 5 Cir. 1978, 583 F.2d 1295, 1298–1300.[17]

Alley admits that under the McClure rule, the mere transfer of his shares to Miramon with the understanding that the shares would be pledged does not accord him standing to sue. He argues, however, that the corporate liquidation that followed the transfer to Miramon, was analogous to a foreclosure of pledged securities and constituted a sale under McClure. Alley's analogy is appealing, but it rests on a faulty premise.

To be a seller under McClure, Alley necessarily must have been a pledgor of securities.[18] The Louisiana Civil Code

---

**16.** See, e. g., Mansbach v. Prescott, Ball & Turben, 6 Cir. 1979, 598 F.2d 1017, 1028–30; Mallis v. FDIC, 2 Cir., 568 F.2d 824, 828–30, cert. granted, 1977, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, cert. dismissed, 1978, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357; Lincoln Nat'l Bank v. Lampe, N.D.Ill.1976, 414 F.Supp. 1270, 1276–78. See also Kerbs v. Fall River Indus., Inc., 10 Cir. 1974, 502 F.2d 731, 738–39.

**17.** For a discussion of the cases dealing with the standing of pledgors and pledgees to sue under Rule 10b–5, see generally 1978–1979 Securities Law Developments—Rule 10b–5, 36 Wash. & Lee L.Rev. 901, 904–06 (1979); Note, Rule 10b–5 Standing—Pledge of Securities in a Loan Transaction Held to Constitute a Sale— Mallis v. FDIC, 52 N.Y.U.L.Rev. 650 (1977); Comment, The Pledge and the Purchase and Sale Requirement of Section 10(b) and Rule 10b–5, 65 Geo.L.Rev. 1593 (1977).

**18.** The principle is well settled that federal law, rather than state law, governs the construction of all aspects of Rule 10b–5, such as standing to sue, Drachman v. Harvey, 2 Cir. 1971, 453 F.2d 722, 727, rev'd on other grounds on rehearing en banc, 2 Cir. 1972, 453 F.2d 736, the proper measure of damages, Baumel v. Rosen, 4 Cir. 1969, 412 F.2d 571, 575, cert. denied, 1970, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681, and whether prejudgment interest is recoverable, Wolf v. Frank, 5 Cir., 477 F.2d 467, 479, cert. denied, 1973, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218. See generally 5 A. Jacobs, The Impact of Rule 10b–5 § 7 at 1–142 to –148. Similarly, whether a pledge is a sale of securities under Rule 10b–5 is a question of federal law. We conclude, however, that whether Alley pledged his securities is an ancillary question not addressed by federal law that must be resolved by referring to state law. Cf. Pomierski v. W. R. Grace & Co., N.D.Ill.1967, 282

defines a pledge as "a contract by which one debtor gives something to his creditor as a security for his debt". LSA–C.C. Art. 3133; see 12A W. Fletcher, Cyclopedia of the Law of Private Corporations § 5638 (Rev. ed. 1972). See generally Slovenko, Of Pledge, 33 Tul.L.Rev. 59 (1958). The requirements of a pledge are: (1) there must be a valid principal obligation, LSA–C.C. Art. 3140; D'Amico v. Canizaro, 1970, 256 La. 801, 239 So.2d 339, 342–43; (2) the pledgor must have an ownership interest in the thing pledged, LSA–C.C. Art. 3142; (3) the pledgee must be put in possession of the property pledged, LSA–C.C. Art. 3152; Succession of Onorato, 1951, 219 La. 1, 51 So.2d 804, 808; American Bank & Trust Co. v. Straughan, La.App., 248 So.2d 73, 77, cert. denied, 1971, 259 La. 746, 252 So.2d 450; and (4) there must be an oral or written contract of pledge. LSA–C.C. Art. 3152; Succession of Onorato, 51 So.2d at 808; Davis v. Davis, La.App.1951, 50 So.2d 647, 652; Slovenko, supra, at 103. The Louisiana Civil Code states that a person may pledge the property of another, provided that the owner expressly or tacitly consents to the pledge. LSA–C.C. Art. 3145; cf. Succession of Onorato, 51 So.2d at 808. Another pertinent section of the Civil Code provides that a person may pledge his property to secure the debt of another. LSA–C.C. Art. 3141.

Here, the requirements of a pledge have not been satisfied. There was a transfer of the shares from Alley to Miramon, but the transfer did not secure a debt. Alley intended that the shares would be used to secure a corporate debt, but the corporation never pledged the shares to a bank as collateral for a loan. There was no delivery of the shares to a corporate creditor and no contract of pledge. Alley, therefore, never became a pledgor. Since there was no pledge, the liquidation of the corporation was not analogous to a foreclosure of pledged securities under McClure.[19]

The district court found that Alley transferred his stock certificate to Miramon, indorsed in blank, pursuant to an agreement that the corporation would pledge the shares to a commercial lending institution. Alley says he did not intend to transfer title to the shares. The appointment of his wife as agent to transfer the shares on the corporate books when the corporation pledged the stock supports his position. Although neither party has advanced the argument, and the district court did not expressly make such a finding, the facts show that the oral agreement between Alley and Miramon created an implied agency relationship.[20] Miramon was Alley's agent with the limited authority to pledge Alley's shares as collateral for a corporate loan.

Since the pledge was never consummated, the question is what effect the transfer of Alley's certificate in blank followed by the issuance of 200 shares to Miramon had on Alley's status as a shareholder. Whether Alley remained a shareholder in Maison Miramon must be determined by examining the provisions of the corporation's charter and the laws of Maison Miramon's state of incorporation, Louisiana.[21]

F.Supp. 385, 393–94 (whether transaction challenged under Section 10(b) of the 1934 Act is a merger or a sale of assets is governed by state law). As a practical matter, state statutes governing pledges are unlikely to vary significantly. Our conclusion, therefore, does not undermine the general principle that Rule 10b–5 actions should be resolved by federal law. See note 21 infra.

19. Having rejected Alley's position that there was a pledge of securities, we need not consider Miramon's argument that Alley, although a pledgor, did not have standing to sue.

20. "Whether an agency has been established is a question of law to be determined by the relations of the parties as they may in fact exist under their agreements or acts." Busby v. Walker, La.App.1955, 84 So.2d 304, 308. The Restatement (2d) of Agency § 26 (1958) provides: "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."

21. Although we find Louisiana law and general principles of agency useful in determining the

At the time of these transactions, the transfer of title to securities was governed by the Uniform Stock Transfer Act, LSA–R.S. § 12:621–643.[22] The Uniform Stock Transfer Act provides that title to a stock certificate and to the shares represented thereby could be transferred "[b]y delivery of the certificate indorsed . . . in blank . . . by the person appearing by the certificate to be the owner of the shares represented thereby". LSA–R.S. § 12:624(A)(1). This rule applies whether the by-laws of the corporation and the certificate itself provide that shares shall be transferred only on the books of the corporation or transferred by a transfer agent. *Id.* at § 12:624(B); *Primeaux v. Libersat*, La.S.Ct.1975, 322 So.2d 147, 150. If the owner of securities delivers a certificate indorsed in blank and intends to transfer legal title, the indorsement is effective even if the transferee received no consideration. LSA–R.S. § 12:629. If the indorsement was procured by fraud, the certificate may be recovered unless the certificate has been transferred to a good faith purchaser for value. LSA–R.S. 12:630. Finally, the person in whose name a certificate representing shares of stock stands or to whom the certificate is indorsed in blank, and who has possession of the certificate, is regarded as the legal owner of the shares. LSA–R.S. § 12:601.

■ If we assume that Alley intended to pass title to the shares, there is no doubt that the indorsement in blank and delivery would have vested title in Miramon. *Feldman v. Plaquemines Oil and Development Co.*, La.S.Ct.1973, 282 So.2d 469, 472. According to Alley's testimony and the district court's implicit findings, however, Alley did not intend to transfer title to Miramon when he surrendered his certificate. The Stock Transfer Act provides that title *can* be transferred by indorsement in blank and delivery, but the "law does not assert unequivocally that indorsement and delivery in all [circumstances] constitutes an irrevocable and actual transfer of legal title". *Id.* at 473. Here, Miramon was Alley's agent for the limited purpose of pledging the stock; there was no agreement or intent to transfer title to the shares. No provision in the Uniform Stock Transfer Act confirms an agent's unqualified right to ownership of a stock certificate indorsed in blank and delivered to him by his principal. *Id.* Possession of an indorsed certificate is generally presumptive evidence of ownership, but where an agency relationship exists, "[t]he *possession of the agent is the possession of the principal*". *Succession of Boisblanc*, 1880, 32 La.Ann. 109, 110, *quoted in Feldman*, 282 So.2d at 473 n.4 (emphasis in original). Only by a mechanical application of the Uniform Stock Transfer Act would we be compelled to find that Miramon became the owner of Alley's shares when Certificate No. 7 was surrendered.

■ Furthermore, Miramon did not become the owner of Alley's shares when the corporation issued to Miramon Certificate No. 8 representing 200 shares. The Uniform Stock Transfer Act provides that where there has been a surrender and cancellation of a former certificate, the former shareholder who acquiesced in the transfer cannot question the validity of the new

effects of the defendants' conduct on Alley's status as a shareholder, we again do not question the well established rule that the parameters of Rule 10b–5 actions are generally governed by federal law. *See* note 18 *supra*; cf. *McClure v. The Borne Chemical Co.*, 3 Cir., 292 F.2d 824, 834, cert. denied, 1961, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (in Section 10(b) cases, "state law will only control where that law will not cut across the federal interests receiving expression in the federal right sought to be enforced"). We note, for example, that had the defendants' conduct affected shareholders in more than one state, the strong federal policy of applying Rule 10b–5 uniformly would be of paramount importance and would control the appropriateness of redress despite inconsistencies in state corporation law. *Cf. J. I. Case Co. v. Borak*, 1964, 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 429. Therefore, we expressly limit our application of state law to the peculiar facts of this case.

22. *See* 7 S. Litvinoff, Louisiana Civil Law Treatise § 78 (1975). The Louisiana Uniform Stock Transfer Act was repealed in 1978. *See* "Investment Securities", LSA–R.S. § 10:8–101 to –406 (Vol. 4 supp. pamphlet 1979).

certificate or the transferee's title to the certificate, at least if the attack is based on an irregularity in the method of transfer, such as failure of transfer agent to register the transfer on the corporate books. *Primeaux v. Libersat*, La.S.Ct.1975, 322 So.2d 147, 149–150. But the irregularity of the *method* of transfer is not in issue. Miramon did not obtain title to Alley's 200 shares when Certificate No. 7 was surrendered, because the surrender was procured by a fraudulent misrepresentation. Miramon's title was not perfected when the corporation issued Certificate No. 8. With respect to Alley, Miramon was still an agent in possession of his principal's shares. The law is settled in Louisiana that there is "no process by which [an] agent can become the owner of the . . . property of his principal, entrusted to him for a special purpose. The unfaithful or imprudent agent may so deal with the property of the principal *as to subject it to the rights of his creditors or other innocent third [parties]* . . . he may illegally convert it to his own uses, and subject himself to criminal prosecution . . . for embezzlement or breach of trust with respect to it; *but he cannot, as against his principal, make it his own*". *Succession of Onorato*, 1951, 219 La. 1, 51 So.2d 804, 813 (quoting *Succession of Boisblanc*, 1880, 32 La.Ann. 109) (emphasis in original); *Daugherty v. Canal Bank and Trust*, 1934, 180 La. 1003, 158 So. 366, 371. The Uniform Stock Transfer Act does not validate a fraudulently procured transfer or provide refuge for an untrustworthy agent. Miramon's literal compliance with the Uniform Stock Transfer Act did not affect Alley's title to 200 shares of Maison Miramon. *Succession of Onorato*, 51 So.2d at 810; *cf. Daugherty*, 158 So. at 370.

■ In November 1971, the shareholders and directors of Maison Miramon amended the Articles of Incorporation and changed the corporation's name to Greenbriar Nursing Home, Inc. The amendment did not provide for any change in corporate purpose. Alley was not notified of the meeting and did not attend it. The November amendment of the Articles of Incorporation did not divest Alley of an equity interest in the successor corporation. The change of a corporation's name is not a change of the identity of a corporation and has no effect on the corporation's property, rights, or liabilities. *Stewart v. Preston*, 1920, 80 Fla. 473, 86 So. 348, 349; *see McCarthy v. Osborn*, 1953, 223 La. 305, 65 So.2d 776, 779. The issuance of 700 shares in the Greenbriar Nursing Home to Miramon also had no effect on Alley's status as a corporate shareholder.

Miramon's fraudulent scheme culminated in December 1971 with the liquidation of Greenbriar Nursing Home. The district judge concluded that the sale of the corporation's assets was fraudulently confected in violation of Section 10(b) of the 1934 Act, but his opinion does not discuss the basis of Alley's standing as a seller. The district court's holding, in view of the underlying facts, leads us to conclude that Alley had standing to sue under the "forced seller" doctrine.

■ A 10b–5 plaintiff must demonstrate that he was an actual purchaser or seller of securities. *See Birnbaum v. Newport Steel Corp.*, 2 Cir., 193 F.2d 461, *cert. denied*, 1952, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356. Courts applying *Birnbaum* have developed several exceptions to the purchaser-seller requirement.[23] In *Vine v. Beneficial Finance Company*, 2 Cir., 374 F.2d 627, *cert. denied*, 1967, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460, the Second Circuit established the forced seller exception to the purchaser-seller requirement which provides standing where an individual is compelled to sell or convert his shares as a result of fraud. *Vine* held that a shareholder in a corporation merged with another corporation had standing to sue under Section 10(b) despite his still having possession of his stock at the time he brought suit. Although no actual sale had occurred, the

---

23. For a discussion of the judicially created exceptions to the *Birnbaum* Rule, see the authorities cited in note 27 *infra*.

plaintiff, as a practical matter, had no option but to exchange his shares for cash, either by accepting the defendant corporation's cash offer or by pursuing his appraisal remedy. The court concluded that since the plaintiff would be forced to accept cash for his shares, to require an actual sale as a prerequisite to standing would be a "needless formality". *Id.* at 634.

This Court has endorsed the *Vine* rationale and has applied the forced seller doctrine to a fraudulent corporate liquidation. *See, e. g., Dudley v. Southeastern Factor and Finance Corp.,* 5 Cir., 446 F.2d 303, *cert. denied,* 1971, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101; *Coffee v. Permian Corp.,* 5 Cir. 1970, 434 F.2d 383, *cert. denied,* 1973, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146.[24] The plaintiff in *Coffee* was a disgruntled minority shareholder in Knight Company. He alleged that the Permian Corporation, through a series of manipulative transactions, obtained a majority of the outstanding shares in Knight Company and control over Knight's Board of Directors. 434 F.2d at 384. Later, the Permian Corporation, during a secret meeting of the Board of Directors of the Knight Company, decided to liquidate the Knight Company and to appropriate its assets solely for the benefit of Permian Corporation. The Knight Company was substantially liquidated without a shareholders meeting to ratify the Board's decision. *Id.* The plaintiff sued the Permian Corporation alleging that as a result of the fraudulent liquidation, he was a seller of securities within the meaning of Section 10(b) of the 1934 Act and Rule 10b–5. The district court dismissed the plaintiff's complaint for lack of standing. On appeal this Court found the liquidation of the Knight Company indistinguishable from the merger in *Vine. Id.* at 386. The plaintiff, like the defrauded shareholder in *Vine,* as a practical matter, would eventually have to become a party to a sale. The Court, in reversing the district court and remanding the case for further findings, noted that if Coffee's stock had been converted by the liquidation to a claim for cash, he had standing to sue as a seller under Section 10(b) and Rule 10b–5. *Id.*

This Court reaffirmed the application of the forced seller doctrine to a corporate liquidation in *Dudley v. Southeastern Factor and Finance Corp.,* 5 Cir. 1971, 446 F.2d 303. The plaintiff in *Dudley* was the receiver of Insurance Investor's Trust Company (IITC). *Id.* at 303. IITC's assets included a certificate of ownership of shares in Southeastern Factor and Finance Corporation (SEFAF). The receiver, after discovering that SEFAF was being liquidated, sued SEFAF, and others, alleging that IITC had not been allowed to participate in the liquidation and that the liquidation defrauded IITC of its investment in violation of Section 10(b) and Rule 10b–5. *Id.* The district court dismissed the receiver's complaint. This Court reasoned that since SEFAF had been substantially liquidated and was a non-functioning corporation, IITC's investment in an ongoing enterprise had been commuted to a right to a payment of money. *Id.* at 308. Applying the forced seller rule, the Court held that IITC had standing to sue as a seller under Section 10(b). *Id.*

Subsequent to this Court's decisions in *Coffee* and *Dudley,* the Supreme Court, in *Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, reaffirmed the purchaser-seller requirement as a limitation on the class of plaintiffs entitled to sue under Rule 10b–5. In *Blue Chip,* the Supreme Court denied standing to sue under Rule 10b–5 to a plaintiff who was an offeree of a stock offering made pursuant to an antitrust consent decree. The Supreme Court advanced several reasons for retaining the purchaser-seller rule. First, the Court noted that lower

---

24. *Accord, Alpex Computer Corp. v. Pitney-Bowles, Inc.,* S.D.N.Y.1976, 417 F.Supp. 328, 330–32; *Rich v. Touche Ross & Co.,* S.D.N.Y. 1976, 415 F.Supp. 95, 98–100; *Garner v. Enright,* E.D.N.Y.1977, [1977–1978 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 96,158 at 92,222.

For other discussions of the forced seller rule by this Court, see *Sargent v. Genesco, Inc.,* 5 Cir. 1974, 492 F.2d 750, 764–65; *Smallwood v. Pearl Brewing Co.,* 5 Cir. 1974, 489 F.2d 579, 593–95.

courts had accepted *Birnbaum* for over 20 years and Congress had failed to broaden Section 10(b) during that period.[25] Furthermore, the plaintiffs' rights under the consent decree were not included in the 1934 Act's definition of a sale. The Court expressed various policy reasons for refusing to broaden the scope of Rule 10b–5. Of primary concern to the Supreme Court was the danger of vexatious nuisance or "strike" suits that could result from expanding the class of plaintiffs under Rule 10b–5 to include those who had not purchased or sold securities. 421 U.S. at 739–40, 95 S.Ct. at 1927. The Court also sought to avoid the potential abuses of the federal discovery provisions and the evidentiary problems that would result from extending the coverage of Rule 10b–5. The Court noted that if a sale of securities were not required, liability would turn on hazy issues of fact, proof of which depended on uncorroborated oral testimony rather than objectively demonstrable facts such as documentary evidence of a sale. *Id.* at 743, 95 S.Ct. at 1929. The *Blue Chip* Court, therefore, refused to dilute the *Birnbaum* Rule. Significantly, *Blue Chip* placed no restrictions on prior applications of the purchaser-seller requirement.

In upholding the *Birnbaum* Rule, the *Blue Chip* Court did not discuss the continued validity of the forced seller exception to the purchaser-seller requirement. Lower courts, however, uniformly have continued to apply the exception.[26] Most commentators have agreed that the forced seller exception is consistent with the rationale behind the purchaser-seller rule.[27]

The forced seller doctrine does not undermine the policy objectives of *Blue Chip*.[28] Reaffirming the doctrine, which was well established prior to *Blue Chip*,[29] does not result in a wide expansion of the class of potential 10b–5 plaintiffs or create the likelihood of nuisance or "strike" suits. When applied in the context of a corporate liquidation, the forced seller exception does not create a danger of an abuse of the litigation process comparable to that which concerned the *Blue Chip* Court. The potential evidentiary problems, for example, discussed in *Blue Chip* are not raised in the context of a corporate liquidation.[30] The only fact

---

**25.** *See* 5 A. Jacobs, The Impact of Rule 10b–5 § 38.01[e] at 2–60 to –61.

**26.** *See, e. g., Marsh v. Armada Corp.,* 6 Cir. 1976, 533 F.2d 978, 981–82, *cert. denied,* 1977, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (citing *Vine* with approval and holding merger exchange a sale under *Blue Chip* ); *Valente v. PepsiCo, Inc.,* D.Del.1978, 454 F.Supp. 1228, 1237 n.10; *Morales v. Gould Investors Trust,* S.D.N.Y.1977, 445 F.Supp. 1144, 1150, *aff'd mem.,* 2 Cir. 1978, 578 F.2d 1369; *Niederhoffer, Cross & Zeckhauser, Inc. v. Telstat Systems Inc.,* S.D.N.Y.1977, 436 F.Supp. 180, 184 & n.6; *Clinton Hudson & Sons v. Lehigh Valley Coop. Farms, Inc.,* E.D.Pa.1977, 73 F.R.D. 420, 425–26, *aff'd mem.,* 3 Cir. 1978, 586 F.2d 834; *Alpex Computer Corp. v. Pitney-Bowles, Inc.,* S.D.N.Y.1976, 417 F.Supp. 328, 330–32; *Rich v. Touche Ross & Co.,* S.D.N.Y.1976, 415 F.Supp. 95, 99–100; *Murphey v. Hillwood Villa Assoc.,* S.D.N.Y.1976, 411 F.Supp. 287, 292; *Weisman v. Darneille,* S.D.N.Y.1978 [1977–1978 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 96,278 at 92,-796; *Garner v. Enright,* E.D.N.Y.1977, [1977–1978 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 96,158 at 92,222. *See also Goodman v. Epstein,* 7 Cir. 1978, 582 F.2d 388, 410 & n.64 (citing *Vine* with approval).

**27.** *See* Jacobs, Standing to Sue under Rule 10b–5 After *Blue Chip Stamps,* 3 Sec.Reg.L.J. 387, 400 (1976); 1976–1977 Securities Law Developments—Rule 10b–5, 34 Wash. & Lee L.Rev. 882, 893–95; Note, Standing Under Rule 10b–5 After *Blue Chip Stamps,* 75 Mich.L.Rev. 413, 431–37 (1976); Comment, *Blue Chip Stamps v. Manor Drug Stores* : Failure to Solve the Purchaser-Seller Problem, 70 Nw.U. L.Rev. 965, 987–89 (1976). *But see* Gallagher, 10b–5 After *Blue Chip Stamps* : How Stands the Judicial Oak, 80 Dick.L.Rev. 1, 36–37 (1975).

**28.** 1976–1977 Securities Law Developments—Rule 10b–5, *supra* note 27, at 895; Standing Under Rule 10b–5 After *Blue Chip Stamps, supra* note 27, at 434–35.

**29.** In *Weisman v. Darneille,* S.D.N.Y.1978, [1977–1978 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 96,278, the court reasoned that the forced seller cases define, rather than reject, the purchaser-seller requirement announced in *Birnbaum* ; therefore, the *Weisman* court held that the forced seller rule is still viable after *Blue Chip.* ¶ 96,278 at 92,796.

**30.** Failure to Solve the Purchaser-Seller Problem, *supra* note 27, at 988–89.

which distinguishes a shareholder in a fraudulently liquidated corporation from an actual seller of securities is that the defrauded shareholder in a liquidated corporation has not transacted the "needless formality of a sale". Proof of a corporate liquidation which may give rise to standing under the forced seller rule is based on objectively demonstrable facts such as shareholder meetings, board resolutions, liquidation sales, and dissolution notices; plaintiff shareholders cannot rely upon uncorroborated oral testimony of injurious misconduct. We conclude, therefore, that the forced seller doctrine, as applied in *Coffee*, remains a valid exception to the purchaser-seller rule.[31]

 Applying *Coffee* to the facts in this case, we hold that Alley has proved a cause of action under Rule 10b–5. The evidence shows that Miramon utilized manipulative and deceptive devices and that there was a sufficient nexus between his fraudulent acts and the forced sale of Alley's securities to satisfy the "in connection with" requirement of Rule 10b–5. Miramon's fraudulent scheme including obtaining Alley's stock certificate by false representations, changing the name of Maison Miramon and liquidating the successor corporation without notice to Alley, and converting the liquidation proceeds to his own use. Although Alley surrendered his stock certificate in June 1971, he remained a shareholder in Maison Miramon and was entitled to the protection provided by Rule 10b–5. When Miramon's scheme culminated in the liquidation, Alley's shares, like those of the plaintiff in *Coffee* were converted to a claim for cash in a non-functioning corporation. Alley, therefore, was a seller of securities and is entitled to recover damages under Rule 10b–5.

## IV.

Both parties appealed the district judge's damage award. Miramon objected on the ground that Alley, as the owner of illegally issued shares, was not entitled to a share of the liquidation proceeds. We previously have rejected this argument. We still must address Alley's contention that he, as the only owner of valid shares in the corporation, should be awarded the entire liquidation proceeds.

 As a general rule, the correct measure of a seller's damages in a 10b–5 action is the difference between the price received and the value of the securities at the time of the fraudulent transaction. *Nor-Tex Agencies, Inc. v. Jones,* 5 Cir. 1973, 482 F.2d 1093, 1097, *cert. denied,* 1974, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873; *see Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741; 5B A. Jacobs, The Impact of Rule 10b–5 § 260:03[c][ii] at 11–19 to –23. This measure of damages is not applicable in the case of a forced seller because there has been no actual sale. The fraudulent liquidation of the Greenbriar Nursing Home converted Alley's shares to a claim for cash in a non-functioning corporation. Alley's damages, therefore, are equal to the value of his claim as a shareholder to the proceeds of the liquidation. *Cf. Speed v. Transamerica Corp.,* D.Del.1955, 135 F.Supp. 176, *modified,* 3 Cir. 1956, 235 F.2d 369.

 Under Louisiana law, shareholders in a liquidated corporation are entitled to share the net liquidation proceeds according to their respective rights and preferences.[32] LSA–R.S. § 12:145(F) (1969)

---

31. Our holdings in *Coffee* and *Dudley* have expressly been approved and applied in several post-*Blue Chip* cases. *See, e. g., Valente v. PepsiCo, Inc.,* D.Del.1978, 454 F.Supp. 1228, 1237 n.10; *Niederhoffer v. Cross & Zeckhauser, Inc. v. Telstat Systems Inc.,* S.D.N.Y.1977, 436 F.Supp. 180, 184 & n.6; *Alpex Computer Corp. v. Pitney-Bowles, Inc.,* S.D.N.Y.1976, 417 F.Supp. 328, 330–32; *Murphey v. Hillwood Villa Assoc.,* S.D.N.Y.1976, 411 F.Supp. 287, 292; *Garner v. Enright,* E.D.N.Y.1977, [1977–1978

Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 96,-158 at 92,222.

32. LSA–R.S. § 12:145(F) (1969) states:
Any net assets remaining, after paying all debts and liabilities of the corporation, including all costs and expenses of the liquidation, shall be paid by the liquidator to the shareholders according to their respective rights and preferences.

(amended version at § 12:145(F) (Cum. Supp.1980)); *Drenning v. Kuebal, Inc.,* La. S.Ct.1976, 339 So.2d 752, 754–55; *In re Dutch O'Neal Motors of Louisiana, Inc.,* La. Civ.App.1963, 148 So.2d 468, 470. Neither the Articles of Incorporation of Maison Miramon nor the liquidation resolution of the shareholders of Greenbriar Nursing Home created any preference among shareholders to the proceeds of the liquidation. Therefore, the shareholders of Maison Miramon were entitled to a pro rata distribution of the liquidation proceeds.

The district court's "Findings of Fact" lists the shareholders of Maison Miramon and their respective shares as follows: Louis Miramon, Jr. (1,095 shares); Gloria Miramon (5 shares); Mrs. Louis Miramon, Sr. (320 shares); and Robert Alley (200 shares). The net liquidation proceeds were $156,866.87. Alley was awarded $19,644.49, plus accrued interest, based on his ownership of 12.4 percent of the outstanding common stock. Alley maintains that the district court, in computing the amount of Maison Miramon stock, included shares that had been issued gratuitously or for inadequate consideration.[33]

Alley argues that neither Miramon nor his wife, Gloria Miramon, contributed any capital in consideration for their shares. Mrs. Louis Miramon, Sr.'s shares were invalid, says Alley, because they were issued in consideration for a personal loan to Miramon rather than for a capital contribution.

Miramon's testimony is inconsistent as to the nature of his capital contribution, but there is sufficient evidence in the record that the $55,000 cash he contributed to facilitate the purchase of the land for the nursing home was a capital contribution.[34] This contribution entitled Miramon to 1100 shares at a par value of $50 per share; 1,095 of these shares were properly issued in his name and 5 in his wife's. Whether Mrs. Louis Mirimon, Sr. contributed capital is unclear. The testimony, although unsupported by documentary evidence, is that she loaned Miramon $25,000 with the understanding that he would invest the money in the nursing home. Miramon apparently transferred the sum to the corporation as working capital. In connection with these transactions, the corporation executed and issued 320 shares to Mrs. Louis Miramon, Sr. She was treated as a shareholder on the corporation's books, and she attended and voted at shareholder meetings. On this evidence, we cannot say that the district court was clearly erroneous in finding that Mrs. Louis Miramon, Sr. owned 320 valid and fully paid shares in the corporation.

We conclude, therefore, that the district court properly computed Alley's damages. The judgment is AFFIRMED.

---

**33.** The general rule is that if some stockholders of a liquidated corporation have not paid in full for their stock, they are entitled to share in the net liquidation proceeds only to the extent of their payments, as against other stockholders who have paid in full. 16A W. Fletcher, Cyclopedia of the Law of Private Corporations § 8224 at 550 (rev.ed.1979).

**34.** *See* note 2 *supra.* In examining Miramon's deposition and his testimony at the trial, we have discovered four conflicting statements regarding his capital contribution. Miramon stated on deposition that he loaned $55,000 to the corporation which it transferred to the St. Tammany Redevelopment Association. The Redevelopment Association used this money to purchase land from Miramon which served as the site of the nursing home. There is no documentary evidence that Miramon loaned $55,000 to the corporation. Miramon testified at the trial that he "put up $55,000 cash money", when the corporation was established, implying that the sum represented a capital contribution. Thorne also testified that Miramon made a $55,000 cash contribution to the corporation which was later transferred to the Redevelopment Association. Miramon also testified, however, that no one paid any money to the corporation in connection with the issuance of stock. Finally, Miramon testified that he contributed $25,000 of working capital to the corporation after receiving a personal loan in that amount from his mother. Despite the inconsistencies in Miramon's testimony, the evidence is strongest that he made a $55,000 capital contribution to the corporation.